J-S21029-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| WILLIE LEE ROBINSON | : | |
| | : | |
| Appellant | : | No. 3004 EDA 2019 |

Appeal from the Judgment of Sentence Entered June 13, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001797-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| WILLIE LEE ROBINSON | : | |
| | : | |
| Appellant | : | No. 3198 EDA 2019 |

Appeal from the Judgment of Sentence Entered June 13, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001788-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| WILLIE LEE ROBINSON | : | |
| | : | |
| Appellant | : | No. 3464 EDA 2019 |

Appeal from the Judgment of Sentence Entered June 13, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001796-2018

J-S21029-21

BEFORE: BOWES, J., OLSON, J., and COLINS, J.*

MEMORANDUM BY OLSON, J.:                    **FILED NOVEMBER 16, 2021**

Appellant, Willie Lee Robinson, appeals from the judgment of sentence entered on June 13, 2019 in the Criminal Division of the Court of Common Pleas of Philadelphia County, as made final by the denial of a subsequent post-sentence motion.[1]  We affirm.

At the conclusion of trial on April 9, 2019, a jury found Appellant guilty of multiple counts of sexual misconduct and violent assaults perpetrated against three of his biological children.  At trial court docket 1788-2018, which involved Appellant's offenses against a female victim we shall refer to as Evel. R., the jury found Appellant guilty of the following crimes:  rape - forcible compulsion (18 Pa.C.S.A. § 3121(a)(1)), criminal attempt - involuntary deviate sexual intercourse (18 Pa.C.S.A. §§ 901(a) and 3123(a)), aggravated indecent assault – without consent (18 Pa.C.S.A. § 3125(a)), incest (18 Pa.C.S.A. § 4302), endangering the welfare of a child – parent/guardian (18 Pa.C.S.A. § 4304), corruption of minors (18 Pa.C.S.A. § 6301), and criminal conspiracy – rape by forcible compulsion (18 Pa.C.S.A. §§ 903 and 3121(a)(1)).

_____

* Retired Senior Judge assigned to the Superior Court.

[1] Upon consideration of a motion filed by Appellant, we consolidated the above-captioned appeals by order entered on October 14, 2020.  *Per Curiam* Order, 10/14/20.  Appellant has fully complied with the mandate of our Supreme Court, as expressed in **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), by filing three separate notices of appeal at each individual trial court docket listed above.

- 2 -

At trial court docket 1796-2018, which involved Appellant's offenses against a female victim we shall refer to as Evet. R., the jury found Appellant guilty of the following crimes: aggravated assault (18 Pa.C.S.A. § 2702), rape - forcible compulsion (18 Pa.C.S.A. § 3121(a)(1)), involuntary deviate sexual intercourse – forcible compulsion (18 Pa.C.S.A. § and 3123(a)), aggravated indecent assault – without consent (18 Pa.C.S.A. § 3125(a)), incest (18 Pa.C.S.A. § 4302), corruption of minors (18 Pa.C.S.A. § 6301), endangering the welfare of a child – parent/guardian (18 Pa.C.S.A. § 4304), and criminal conspiracy – rape by forcible compulsion (18 Pa.C.S.A. §§ 903 and 3121(a)(1)).

At trial court docket 1797-2018, which involved Appellant's offenses against a male victim we shall refer to as W. R., the jury found Appellant guilty of the following crimes: aggravated assault (18 Pa.C.S.A. § 2702), rape - forcible compulsion (18 Pa.C.S.A. § 3121(a)(1)), involuntary deviate sexual intercourse – forcible compulsion (18 Pa.C.S.A. § and 3123(a)), incest (18 Pa.C.S.A. § 4302), endangering the welfare of a child – parent/guardian (18 Pa.C.S.A. § 4304), corruption of minors (18 Pa.C.S.A. § 6301), and criminal conspiracy – rape by forcible compulsion (18 Pa.C.S.A. §§ 903 and 3121(a)(1)).

At a sentencing hearing convened on June 13, 2019, the trial court directed Appellant to serve an aggregate period of state confinement totaling 80 to 160 years. In addition, after defense counsel and the Commonwealth stipulated that Appellant was subject to lifetime registration as a Tier III

sexual offender under the Sexual Offender Registration and Notification Act (SORNA), *see* 42 Pa.C.S.A. §§ 9799.10-9799.41 (offenses included within Tier III classification listed at § 9799.14(d)), the court ordered Appellant to register for life and to comply with all relevant statutory requirements. The Commonwealth did not seek to designate Appellant as a sexually violent predator pursuant to SORNA. *See* 42 Pa.C.S.A. §§ 9799.12 (defining sexually violent predator) and 9799.24 (assessments).

Appellant filed a timely, counseled post-sentence motion on June 21, 2019, which the trial court denied on September 12, 2019. Appellant subsequently filed notices of appeal at all three trial court docket numbers on October 15, 2019. Pursuant to trial court order under Pa.R.A.P. 1925(b), Appellant filed a concise statement of errors complained of on appeal. The trial court issued its Rule 1925(a) opinion on September 15, 2020. On appeal, Appellant challenges: a) the order consolidating all three trial court dockets for purposes of trial; b) a trial court order permitting the Commonwealth to introduce prior bad acts evidence pursuant to Pa.R.E. 404(b); c) the sufficiency of the evidence introduced in support of certain convictions; and, d) the exercise of the trial court's discretion in fixing Appellant's individual and aggregate sentences. *See* Appellant's Brief at 8.

We have carefully reviewed the certified record, the submissions of the parties, and the Rule 1925(a) opinion issued by the trial court. Based upon our review, we are convinced that the claims raised by Appellant on appeal are without merit and that the trial court has thoroughly and accurately

examined each of Appellant's contentions. Accordingly, we affirm Appellant's convictions and judgments of sentence for the reasons set forth by the trial court and adopt its September 15, 2020 opinion as our own. Henceforth, the parties are directed to attach a copy of the trial court's opinion to each filing pertaining to our disposition in this appeal.

Judgments of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/16/2021

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

**FILED**

SEP 15 2020

Office of Judicial Records
Appeals/Post Trial

COMMONWEALTH OF PENNSYLVANIA ) PHILADELPHIA COUNTY
                                   ) COURT OF COMMON PLEAS

VS.                                ) CP-51-CR-0001796-2018 (3464 EDA 2019)

                                       ) CP-51-CR-0001797-2018 (3004 EDA 2019)

WILLIE LEE ROBINSON           ) CP-51-CR-0001788-2018 (3198 EDA 2019)

OPINION

Willie Lee Robinson, the above-named Defendant/Appellant, seeks review of the Judgments and Orders of Sentence entered on August 23, 2019, following jury trial, by the Honorable Anne Marie Coyle, Judge of the Court of Common Pleas for the First Judicial District Criminal Division, hereinafter referred to as "this Court" or the "trial court." Within his counselled Statement of Matters Complained of on Appeal, filed pursuant to Pa.R.A.P. §1925(b), Appellant claimed that the trial court had erred by granting consolidation of the three above-captioned cases and by granting admission of evidence of Appellant's prior bad acts. Appellant also alleged that all jury verdicts of guilt had been supported by insufficient evidence and had been rendered against the weight of evidence. Finally, Appellant asserted that the respective Orders and Judgments of Sentence had constituted abuse of the trial court's sentencing discretion.

A full and fair review of the record demonstrated that consolidation of cases and permission of evidence admission had been properly granted pursuant to Pa.R.E.404(b) and its progeny. Each joined case along with the referenced admitted evidence had been intrinsically intertwined to demonstrate Appellant's intent, continuing course of conduct and common plan and design to

-1-

commit multiple forms of forcible rape, aggravated assault, aggravated indecent assault, and incest, upon his biological then minor children, in concert with the victims' biological mother over several years.

The transcribed record further reflected that each of the twenty-one guilty jury verdicts had been soundly supported and weighted by credible and compelling evidence. Finally, that same record documented sound assessment of all relevant sentencing factors and reasonable rationale underlying imposition of the respective Judgments and Orders of Sentence. All imposed sentences for the twenty-one predominantly felony offenses for which Appellant had been convicted by the jury had reflected fair punishment for Appellant's longstanding predatory sexual and physical abuse inflicted upon the three named victims, his biological children, particularly during their formative years.

PROCEDURAL HISTORY

The above-captioned cases stem from the arrest of Appellant, Willie Lee Robinson, in Philadelphia County following investigation and resulting execution of authorized warrants on February 5, 2018. Appellant was charged and arraigned with numerous offenses related to allegations that he had repeatedly sexually and physically assaulted over multiple years three of his biological children, his son "W.R.," his daughter "Evet.R." and his mentally challenged daughter "Evel.R." A prima facie case was established as to each offense in each case that had identified the separate sibling victims at a consolidated preliminary hearing held on March 2, 2018 excepting the charges of Conspiracy. Following successfully refiling and pursuit of the Commonwealth's Motions to Reinstate the Charge of Conspiracy in each of the three matters, the Conspiracy offenses that reflected Mr. Robinson's complicity in concert with Evelyn Robinson, wife and biological mother of these same children victims, as the charged and subsequently

-2-

cooperating co-defendant, was reinstated upon presentation of proof that Evelyn Robinson had actively and passively participated in commission of Appellant's crimes.

After corresponding bills of information had been prepared citing all related offenses committed by Appellant upon each sibling victim, and holding of preliminary arraignments, the three instant cases then traversed together through the Court of Common Pleas for the First Judicial District of Pennsylvania. The case listing charges with Appellant's now adult disabled daughter "Evel.R." as the named victim were docketed under **CP-51-CR-0001788-2018**. The case listing charges with Appellant's now adult daughter "Evet.R." as the named victim were docketed under **CP-51-CR-0001796-2018**. The case listing charges with Appellant's now adult son "W.R." as the named victim were docketed under **CP-51-CR-0001797-2018**.

On July 30, 2018, during the scheduling conference held before this Court, all three above-captioned cases related to Appellant's abuse of victims Evel.R., Evet.R., and W.R. were listed before this Court as supervising jurist. The singularly scheduled jury trial was set to begin November 26, 2018. The three related cases of co-defendant Evelyn Robinson had also been listed for the same jury trial date with Appellant's matters. The Commonwealth of Pennsylvania as represented by the District Attorney of Philadelphia Larry Krasner, by and through his Assistant District Attorney Elizabeth Fisher. Appellant has been and continues to be represented by court-appointed counsel, Jonathan J. Sobel, Esquire during the pre-trial, trial, sentencing and appellate phases. No objection to a consolidated trial with both defendants and all cases had been raised throughout the preliminary process.

On October 17, 2018, the Commonwealth filed a Motion to Introduce Prior Bad Acts to which Appellant filed a counselled oppositional response. The Motion to Introduce Prior Bad Acts

referenced allegations that had been docketed in Philadelphia County under **CP-51-CR-0805941-1999** after established prima facie case, of Appellant's commission with his wife co-defendant Evelyn Robinson of similar sexual abuse of another of their biological daughter **"B.R."** in 1999. That case had been *nolle prossed* against both defendants on April 3, 2000 at the trial stage in the Court of Common Pleas after their then sixteen-year-old daughter **B.R.** as the named victim had been convinced by family members to refuse to cooperate with the criminal prosecution of her parents.

On November 5, 2018, after full and fair hearing, this Court granted the Commonwealth's Motion to Introduce Prior Bad Acts, denied the defense objection to a consolidated jury trial, and formally permitted the consolidation of the three pending cases for trial to begin as previously scheduled on November 26, 2018. The Commonwealth's verbal and written arguments to support of the introduction of the proffered bad acts evidence consistent with construction and case law interpretation of Pa. R.E. 404(b) were adopted.

Appellant was duly advised on the record that his wife and co-defendant, Evelyn Robinson had, as previously expected, entered negotiated guilty pleas following her allocution and admission of her conspiratorial conduct with Appellant relative to each named victim. Appellant was also formally advised that his wife's sentence had been deferred pending her anticipated testimonial cooperation with the prosecution in Appellant's jury trial.

On November 26, 2018, the jury trial was delayed following belated and baseless assertion of Appellant's mental health incompetency. Thereafter, respective colloquies of Appellant had been conducted by this Court and corresponding mental health evaluations and commensurate commitments were ordered. It was determined following comprehensive forensic evaluations of

Appellant predominantly conducted by Dr. John O'Brien, as the neutral court appointed psychiatrist for the First Judicial District of Pennsylvania Court of Common Pleas, that Appellant had been malingering and feigning mental incompetence to delay trial. No further defense request for delay due to alleged mental incompetency was raised upon review of the neutral evaluations and colloquies.

Trial testimony began on April 3, 2019 after jury selection, presentation of opening statements of both counsel and provision of preliminary instructions to the jury. The prosecution concluded its case in chief on April 8, 2019 followed by the defense introduction of certain exhibits. Appellant chose not to testify. Closing arguments and final instructions were completed late afternoon on April 8, 2019. The jury returned verdicts of guilt late afternoon on April 9, 2019, after seeking additional guidance in the form of two questions that had been answered by this Court.

The jury returned guilty verdicts to twenty-one of the twenty-nine charges listed in the three consolidated cases as follows:

> As to case docketed under **CP-51-CR-0001788-2018** that identified female victim as **Evel.R.**: Count 2: Rape by Forcible Compulsion, 18 § 3121 §§ 1, graded as a Felony of the First Degree; Count 3: Attempt-Involuntary Deviate Sexual Intercourse, 18 §901§§ A, graded as a Felony of the First Degree; Count 4: Aggravated Indecent Assault-Without Consent, 18 § 3125 §§ 1, graded as a Felony of the Second Degree; Count 6: Incest, 18 § 4302, graded as a Felony of the Second Degree; Count 7: Endangering Welfare of Children-Parent/Guardian, 18 § 4304 §§ A, graded as a Felony of the Third Degree; Count 8: Corruption of Minors, 18 §6301 §§ A1, graded as a Misdemeanor of the First Degree; Count 13: Conspiracy-Rape Forcible Compulsion, 18 §903, graded as a Felony of the First Degree.

> As to case docketed under **CP-51-CR-0001796-2018** that identified female victim as **Evet.R**: Count 1: Aggravated Assault, 18 § 2702 §§ A, graded as Felony of the First Degree; Count 2: Rape by Forcible Compulsion, 18 § 3121 §§ 1, graded

as a Felony of the First Degree;[1] Count 3: Involuntary Deviate Sexual Intercourse by Forcible Compulsion, 18 §3123 §§ A1, graded as a Felony of the First Degree; Count 5: Aggravated Indecent Assault-Without Consent, 18 § 3125 §§ 1, graded as a Felony of the Second Degree; Count 7: Incest, 18 § 4302, graded as a Felony of the Second Degree; Count 8: Corruption of Minors, 18 §6301 §§ A1, graded as a Misdemeanor of the First Degree; Count 12: Endangering Welfare of Children-Parent/Guardian, 18 § 4304 §§ A, graded as a Felony of the Third Degree; Count 13: Conspiracy-Rape Forcible Compulsion, 18 §903, graded as a Felony of the First Degree. [2]

As to case docketed under **CP-51-CR-0001797-2018** that identified male victim as **W.R.**: Count 1: Aggravated Assault, 18 § 2702 §§ A, graded as Felony of the First Degree; Count 2: Rape by Forcible Compulsion, 18 § 3121 §§ C, graded as a Felony of the First Degree; Count 3: Involuntary Deviate Sexual Intercourse by Forcible Compulsion, 18 §3123 §§ A1, graded as a Felony of the First Degree; Count 6: Incest, 18 § 4302, graded as a Felony of the Second Degree; Count 7: Endangering Welfare of Children-Parent/Guardian, 18 § 4304 §§ A, graded as a Felony of the Third Degree; Count 8: Corruption of Minors, 18 §6301 §§ A1, graded as a Misdemeanor of the First Degree; Count 12: Conspiracy-Rape Forcible Compulsion, 18 §903, graded as a Felony of the First Degree.

Upon recording of guilty verdicts, this Court revoked Appellant's bail and directed the completion of Presentence Evaluations and Mental Health Assessments by the First Judicial District Probation and Parole Departments and scheduled the sentencing hearing in due course for June 13, 2019. This Court also directed that a Sexual Violent Predator Assessment pursuant to "SORNA"[3] be completed prior to the scheduled sentencing hearing.

On the sentencing hearing date of June 13, 2019, the Commonwealth's representative identified the office policy choice not to pursue the "SORNA Sexual Violent Predator" assessment

---

[1] In preparation of the instant opinion, this Court noticed the scrivener's errors contained within the docketed Order of Sentence under CP-51-CR-0001796-2018 as applied to Count 2 and Count 13 as follows: Count 2 reflected conviction and sentence for Rape of A Child, pursuant to 18 § 3121 §§ C as a felony first degree; **Count 2** should have reflected **Rape by Forcible Compulsion**, 18 § 3121 §§ 1, as a felony first degree; and Count 13 which should have reflected **Conspiracy-Rape by Forcible Compulsion** 18 §903, F1 was incorrectly coded as **Conspiracy-Rape of A Child** pursuant to 18 §903, F1;

As a result, this Court entered a corrective Order of Sentence that properly reflected the charges upon which Appellant had been convicted consistent with previous permitted amendments identified on April 2, 2019 and commensurate jury instructions and notice of same without objection by the defense.

[2] See Footnote 1.

[3] "SORNA" = Sexual Offender Registration and Notification Act, 42 Pa.C.S. §§9799.10-9799.75, Acts 10 & 29, effective February 21, 2018 and re-enacted June 12, 2018.

-6-

or corresponding designation. All parties by and though their counsel agreed that Appellant was to be designated as "SORNA Tier III Sex Offender," which requires lifetime registration. Following full sentencing hearing, and after thorough review of all completed presentence reports and of all relevant sentencing data including, recommended guideline calculations, victim impact and argument on behalf of both parties and testimony submitted, the following Orders of Sentence were imposed:

As to case docketed under **CP-51-CR-0001788-2018** that identified Appellant's daughter **Evel.R.** as victim:

Count 2: Rape by Forcible Compulsion, 18 § 3121 §§ 1, F1: Minimum seven (7) years to maximum fourteen (14) years of state supervised term of confinement;

Count 3: Attempt-Involuntary Deviate Sexual Intercourse, 18 §901§§ A, F1: Minimum six (6) years to maximum twelve (12) years of state supervised term of confinement run consecutively to Count 2;

Count 4: Aggravated Indecent Assault-Without Consent, 18 § 3125 §§ 1, F2: Minimum six (6) years to maximum twelve (12) years of state supervised term of confinement running consecutively to Counts 3 and 2;

Count 6: Incest, 18 § 4302, F2: Minimum five (5) years to maximum ten (10) years of state supervised term of confinement running concurrently to Count 2;

Count 7: Endangering Welfare of Children-Parent/Guardian, 18 § 4304 §§ A, F3: Minimum three (3) years six (6) months to maximum seven (7) years of state supervised term of confinement running concurrently to Count 3;

Count 8: Corruption of Minors, 18 §6301 §§ A1, M1: Minimum two (2) years (6) months to maximum five (5) years of state supervised term of confinement running concurrently to Count 4;

Count 13: Conspiracy-Rape Forcible Compulsion, 18 §903, F1: Minimum seven (7) years to maximum fourteen (14) years of state supervised term of confinement running consecutively to Counts 2, 3, ad 4.

Since four of the seven imposed sentences for each of the separately convicted felony graded offenses were run consecutively to each other, the aggregate period of confinement was

-7-

computed in case docketed under **CP-51-CR-0001788-2018** to be a minimum of twenty-six (26) years to fifty-two (52) years of state supervised confinement. Credit was provided for custodial time served. Rehabilitative conditions were imposed.

As to case docketed under **CP-51-CR-0001796-2018** that identified Appellant's daughter **Evet.R** as victim:

Count 1: Aggravated Assault, 18 § 2702 §§ A, F1: Minimum seven (7) years to maximum fourteen (14) years of state supervised term of confinement;

Count 2: Rape of Child, 18 § 3121 §§ C, F1: Minimum seven (7) years to maximum fourteen (14) years of state supervised term of confinement running consecutively to Count 1;[4]

Count 3: Involuntary Deviate Sexual Intercourse by Forcible Compulsion, 18 §3123 §§ A1, F1: Minimum seven (7) years to maximum fourteen (14) years of state supervised term of confinement running consecutively to Counts 1 and 2;

Count 5: Aggravated Indecent Assault-Without Consent, 18 § 3125 §§ 1, F2: Minimum six (6) years to maximum twelve (12) years of state supervised term of confinement running concurrently to Count 1;

Count 7: Incest, 18 § 4302, F2: Minimum five (5) years to maximum ten (10) years of state supervised term of confinement running concurrently to Count 1;

Count 8: Corruption of Minors, 18 §6301 §§ A1, M1: Minimum two (2) years six (6) months to five (5) years of state supervised confinement running concurrently to Count 2;

Count 12: Endangering Welfare of Children-Parent/Guardian, 18 § 4304 §§ A, F3: Minimum three (3) years six (6) months to seven (7) years of state supervised confinement running concurrently to Count 3;

Count 13: Conspiracy-Rape of Child, 18 §903, F1: Minimum seven (7) years to fourteen (14) years of state supervised confinement running consecutively to Counts 1, 2 and 3.[5]

---

[4]See Footnote 1.
[5]See Footnote 1.

Since four of the eight imposed sentences for each of the separately convicted felony graded offenses were run consecutively to each other, the aggregate period of confinement was computed in case docketed under **CP-51-CR-0001796-2018** to be a minimum of twenty-six (26) years to fifty-two (52) years of state supervised confinement. Credit was provided for custodial time served. Rehabilitative conditions were imposed.

As to case docketed under **CP-51-CR-0001797-2018** that identified Appellant's son **W.R.** as victim:

Count 1: Aggravated Assault, 18 § 2702 §§ A, F1: Minimum seven (7) years to maximum fourteen (14) years of state supervised term of confinement;

Count 2: Rape by Forcible Compulsion, 18 § 3121 §§ C, F1: Minimum seven (7) years to maximum fourteen (14) years of state supervised term of confinement;

Count 3: Involuntary Deviate Sexual Intercourse by Forcible Compulsion, 18 §3123 §§ A1, F1: Minimum seven (7) years to maximum fourteen (14) years of state supervised term of confinement;

Count 6: Incest, 18 § 4302, F2: Minimum five (5) years to maximum ten (10) years of state supervised term of confinement;

Count 7: Endangering Welfare of Children-Parent/Guardian, 18 § 4304 §§ A, F3: Minimum three (3) years six (6) months to maximum seven (7) years of state supervised term of confinement;

Count 8: Corruption of Minors, 18 §6301 §§ A1, M1: Minimum two (2) years (6) months to maximum five (5) years of state supervised term of confinement;

Count 12: Conspiracy-Rape Forcible Compulsion, 18 §903, F1: Minimum seven (7) years to maximum fourteen (14) years of state supervised term of confinement;

Since four of the seven imposed sentences for each of the separately convicted felony graded offenses were run consecutively to each other, the aggregate period of confinement was computed in case docketed under **CP-51-CR-0001797-2018** to be a minimum of twenty-eight (28) years to fifty-six (56) years of state supervised confinement. Credit was provided for custodial time served. Rehabilitative conditions were imposed.

The cumulative sentences of each of the cases affecting three separate victims were directed to run consecutively with each other. Thus, the aggregate sentences were calculated to be a minimum period of eighty (80) years to a maximum period of one hundred sixty (160) years of state supervised confinement. The records were sealed. Appellant was ordered to mandatorily register over the remainder of his life-time as a SORNA Tier III Sex Offender with the state police and to comply with all Tier III Megan's Law or SORNA requirements, including DNA, fingerprinting, palm printing, and photo submission. Appellant was also directed to have no unsupervised contact with minors under any circumstances and have absolutely no contact with the victims and his co-defendant Evelyn Robinson. Additionally, Appellant was ordered to avail himself of continuing anger management and sex offender treatment.

Following imposition of the respective Orders of Sentence, a counselled *Post-Sentence Motion of Defendant, Willie Lee Robinson* was filed on June 21, 2019 in each of the three respective cases which recited the same claims as stated within the instant appeal. Following full hearing, wherein counsel for each party was physically present and Appellant was present via video from the state institution where he has been confined, this Court denied the post-verdict motions on September 12, 2019. Counseled Motions to Unseal the Portions of the Record were filed in the instant matters which were resolved by entry of clarifying Orders permitting Appellant's counsel of record to view all Orders, exhibits, dockets and referenced documents.

The counselled Notice of Appeal was filed in each of the three cases on behalf of Appellant on November 14, 2019. Orders of Court directing the filing of a Concise Statement of Errors Complained of on Appeal in each case pursuant to Pa.R.A.P. 1925(b) had been entered on February 21, 2020. *Defendant, Willie Lee Robinson's Statement Pursuant to Pa.R.A.P. 1925(b)* was filed

for each case by and through Appellant's trial and sentencing counsel Jonathon J. Sobel, Esquire

on February 25, 2020 which raised the following verbatim appellate claims:

a. Whether the trial court erred in consolidating the three (3) cases involving W.R., Evet.R., and Evel.R. for purposes of trial.

b. Whether the trial court erred in granting the Commonwealth of Pennsylvania's Motion To Admit a prior bad act involving defendant Willie Lee Robinson and another individual named B.R.

c. Whether there was sufficient evidence presented warranting the verdict of guilty as to the following victims and following charges:

   1. Evel.R.-rape (forcible compulsion), criminal attempt-I.D.S.I. (forcible compulsion), aggravated indecent assault (without consent); conspiracy, incest, CMOM and EWOC;

   2. Evet.R.-aggravated assault, rape of a child, I.D.S.I (forcible compulsion), Aggravated Indecent Assault (without consent), conspiracy, incest, C.M.O.M., and E.W.O.C.; and

   3. W.R.-aggravated assault, rape (forcible compulsion), I.D.S.I (forcible compulsion), conspiracy, E.W.O.C., C M.O.M.

   4. Whether the jury's verdicts of guilty on twenty-one (21) of twenty-three (23) charges (of) against Defendant, Willie Lee Robinson was against the weight of the evidence.

   5. Whether the trial court abused its discretion in sentencing Defendant, Willie Lee Robinson to 80 to 160 years of state incarceration.

## FACTUAL HISTORY

Appellant's underlying arrest on February 5, 2018 stemmed from in person reports to the

assigned investigator Detective Linda Blowes of the Philadelphia Police Department Special

Victims Unit on December 21, 2017 from investigative social worker Guy DeRitis, who had been

contracted by the City of Philadelphia Department of Humans Services to provide Adult Protective

Services. Mr. DeRitis informed police investigators that he had been dispatched to Jefferson

Hospital to investigate reports of sexual abuse upon then thirty-four-year-old female mentally

-11-

challenged patient who was being treated for elevated blood pressure, and other complications from twenty-two (22) weeks of pregnancy without pre-natal care. That patient was later identified as Appellant's biological daughter victim Evel.R.

Evel.R. had reported to Mr. DeRitis at the hospital that she had been repeatedly sexually abused and raped by her biological father Willie Robinson for years and that her parents were trying to harm her. Evel.R. had also revealed that her biological mother Evelyn Robinson had also physically abused her and had transported her to a Women's Clinic for an abortion just prior to admission to Jefferson Hospital on 12/16/2017. The Women's Clinic had checked Evel.R.'s blood pressure and immediately directed them to Jefferson Hospital and determined that Evel.R. had not been medically cleared for an abortion. Evel.R. disclosed that her father may be the biological father of her unborn child and that both her mother and father had been attempting to force her to have an abortion against her wishes to hide her father's abuse.

While at Jefferson Hospital, Evel.R.'s now adult siblings were contacted by phone. Each sibling confirmed that Evel.R. had disclosed to them that their father had been sexually abusing her for years and that her mother had been physically abusing her in the hopes of causing an abortion. The siblings stated that their parents had been refusing to allow them or anyone access to Evel.R. and that they feared for her well-being. They also reported being similarly physically and sexually abused by their parents. The investigative social workers left Jefferson Hospital and went directly to the Philadelphia Police Department Special Victims' Unit. In the interim, Evel.R. however was released from Jefferson Hospital in care of her parents.

Based upon the investigative data gleaned thus far and fearing immediate harm to Evel.R., Mr. DeRitis, members of the Philadelphia Special Victims Unit and uniformed patrol officers from the 25th district responded to 4549 Hurley Street in Philadelphia to conduct a safety check. Upon

-12-

arrival, Evel.R. stated to Det. Blowes that she had wanted to leave her father's house to live with her sister and that had wished to provide a statement about the of years of sexual and physical she had suffered by her father Willie Robinson. She insisted that she had wanted to keep her baby.

Subsequently, a forensic interview was conducted by an experienced forensic interviewer Michelle Kline at the Philadelphia Children's Alliance during which Evel.R., despite her mental challenges, provided consistent revelations about the years of sexual and physical abuse that she had experienced. In summary, Evel.R. reported that her father would routinely come into her room at night beginning when she was about fourteen (14) years old to engage in forced sexual intercourse and deviate sexual intercourse. She said he had repeatedly touched her breasts and butt with his hands and penetrated entreated her vagina with his fingers and with his penis. She said he would have her engage in oral sex by moving her head toward his penis inside their residence. She said he would usually come into her bedroom when everyone was sleeping and force her to have sex with him. He would threaten her that she would never see her sisters. Evel.R. reported that the penetration had hurt her vagina. She said that all of her sisters had left her home as he continued to touch her.

Evel.R. stated that she had believed that her boyfriend was the likely father of her unborn baby and that she had wanted to keep her baby. She provided her boyfriend's information. She divulged that her mother knew what was happening and that she would get upset about what her father was doing to her. She said that her mother had wanted her to have an abortion despite her wish to keep her baby and had punched her in an effort to cause a miscarriage. Evel.R. stated that her father had recently stopped raping her upon finding out that she had been pregnant and that he had also insisted that she have an abortion.

-13-

Detective Blowes contacted Evel.R.'s then thirty-three-year-old brother W.R. initially by phone, during which W.R. had summarily disclosed that his father had:

"touched us when we were small. He had us touch each other and he had us touch our mother. He did stuff he wasn't supposed to as a father. He would touch my private part until it got hard, then he went down on me putting my "thing" (penis) into his mouth. He did it to me to me during a three-year period when I was about sixteen years old until I was eighteen (28) while living at 5472 New Place, the projects in West Philly and when we moved to North Philly. I seen him touch my sisters Evet.R., B.R. and Evel.R.. I have seen him on top of them doing thing a father shouldn't do. He would have me stand up and have my mom jerk me off and he had me put "it" (my penis) inside her (vagina). He physically harmed us too. He whipped me with a water hose. He stripped us down butt naked and whipped us between the legs. Not just me, my brothers and sisters too."

W.R. provided more details of the abuse during the formal interview conducted by Detective Blowes. He recalled that when he was about thirteen years old while living in the 5400 block of New Place his mother would touch his penis until he was aroused, and then "lube his penis up" and place his penis inside her mouth. She aided in putting his penis in his father's butt. He remembered other times as a child when he had been forced to remove his clothing, lay in bed with both parents while watching pornography and to have sexual intercourse with his mother by penetrating her vagina with his penis.

W.R. said that on multiple occasions, he had been forced to engage in sexual intercourse with his intellectually challenged sister Evel.R. by penetrating her vagina with her penis. He also detailed his observations of his father having sexual intercourse with this same sister on multiple occasions. W.R. reported several instances of physical abuse particularly as a child which included being handcuffed to fixed objects and being beaten by his father. He said that he and all of his sibling lived in great fear of his father and that he had been forced to engage in sexual activities with his parents and siblings from about 1997 at the age of thirteen (13) years until about 2004 at

-14-

the age of twenty (20) years old. W.R.'s verbatim interviews were memorialized by Detective Blowes within the police reports.

Investigators spoke to Evet.R. who was then thirty-six (36) years old because she was the initial prompt complaint witness with respect the sexual abuse allegations made by her younger sister Evel.R. During this interview, Evet.R. reported that she had also been repeatedly raped and sexually abused by her father Willie Lee Robinson and her mother Evelyn Robinson at their prior residences in Philadelphia in a myriad of ways beginning when she was about twelve (12) years old and continuing until she was twenty (20) years of age. She disclosed that her father often penetrated her vagina and her mouth with his penis.

She stated that her mother had not only been aware of these incidents, she had actively participated by helping to hold her down during the attacks and by placing her mouth on her vagina and penetrating her vagina with "toys." Evet.R. stated that both of her parents had used force and threats of physical harm as well as threats to remove her from her home to keep her from disclosing anything. Det. Blowes memorialized Evet.R.'s verbatim statement.

Investigators formally interviewed then thirty-five (35) year old B.R., who stated that her sister Evet.R. called her about their younger sister Evel.R. being twenty-two (22) weeks pregnant and in Jefferson Hospital. Based upon the information that she had received she reported the information to social services. When contacted their sister, B.R. stated that she had been sexually abused along with her siblings in the past as well. She also reported that her sister Evel.R. told her that her parents tried to hit her in the stomach to cause her to lose the baby. Once Evel.R. was removed from her parents' residence, B.R. became the legal guardian of her sister Evel.R.

Investigation further demonstrated that B.R. had previously reported, that at the age of sixteen years old, being sexually abused by her father and her mother's complicity in 1999 after

-15-

she disclosed the ongoing attacks to a trusted high school coach. Those disclosures led to the Philadelphia arrests of both Appellant, Willie Lee Robinson, and his wife Evelyn Robinson. B.R. had been removed from the defendants' home and had testified to the salient events at a preliminary hearing. Thereafter however, she refused to participate in the prosecution of her parents following exertion of pressure from family members. All criminal charges were withdrawn at time of trial.

Search and Arrest Warrants were issued based upon submission of sound affidavits of probable cause by SVU Detective Linda Blowes. After several unsuccessful attempts to locate and arrest Appellant, he surrendered February 5, 2018. Subsequent DNA samples were obtained from Appellant's submitted buccal swab and compared to the fetus tissue samples submitted after Evel.R. had miscarried. Analysis reflected that Appellant was excluded as the contributing DNA to the fetus tissue. Prior to trial co-defendant Evelyn Robinson provided a statement as part of a negotiated guilty plea proffer wherein she had admitted not only her awareness of Appellant's long standing sexual and physical abuse of her children but her complicity as an active and passive participant in the attacks upon her children committed over the course of multiple years.

DISCUSSION

The claims recited within the counselled *Defendant, Willie Lee Robinson's Statements Pursuant to Pa.R.A.P. 1925(b)* filed in each of the above-listed cases mirrored each other. Essentially each Statement of Errors asserted that the trial court had erred by consolidating the three above-captioned cases against Appellant for trial and by granting the Motion to Admit Prior Bad Acts filed on behalf of the Commonwealth of Pennsylvania. Further, Appellant broadly alleged that all twenty-one guilty verdicts recorded by the fact-finding jury had been insufficiently supported by evidence, and alternatively, that the guilty verdicts had been rendered contrary to

-16-

weight of trial evidence. Finally, Appellant generally complained about the aggregate length of the imposed periods of confinement of the respective Orders of Sentence.

Summarily, as set forth more fully below, all of Appellant's arguments fail because: the instant matters had been reasonably joined because all addressed the extreme forms of physical and sexual abuse that Appellant had exerted individually and collectively upon his three biological children over an extensive period of time; the introduction of evidence concerning Appellant's previous sexual abuse upon his other biological daughter had been properly admitted pursuant to Pa.R.E. 404(b) and it's progeny; clear, convincing and credible evidence had supported each conviction; and the respective Orders of Sentence imposed upon Appellant for each offense for which Appellant had been duly convicted were justifiably imposed particularly given the harm that Appellant had knowingly and systematically inflicted upon his three vulnerable and defenseless children during their developmental years.

## I.     Case consolidation had constituted proper exercise of trial court discretion.

Appellant generally complained that the trial court had "erred in consolidating the three (3) cases involving W.R., Evet.R., and Evel.R. for purposes of trial." These matters however had been properly joined because relevant evidence of the fact patterns from each one had been inextricably woven with the others. All complainants, W.R., Evet.R., and Evel.R., were the biological children of both Appellant and his co-conspirator Evelyn Robinson. Each victim reported and testified at trial to experiencing very similar course of conduct or patterned acts of physical, psychological and sexual torture at the hands of both of their parents particularly over the span of their formative childhood years. They related what their parents did to them individually and also testified as eyewitnesses and at times as forced participants in similar sexual abusive acts with their siblings. Their respective testimonies had been highly probative of Appellant's continuing course of

-17-

criminal conduct and of his common scheme and design to commit similar predatory acts with his children whom he had unfettered access in their home away from the prying eyes of the public.

Since the respective accounts of each witness, which included all victims as well their mother, and cooperating former co-defendant, Evelyn Robinson, would have been admissible to prove Appellant's guilt in the individual cases, joinder was a sensible link of resources. Moreover, consolidation had posed no undue prejudice to Appellant. His defense to each set of allegations was identical. During pre-trial hearings he maintained that all of his children had lied and coerced each other and his wife to lie about him. To defeat this announced defense of fabrication to the offenses that all had happened secretly behind closed doors, the prosecution needed to introduce the corroborating testimony of each sibling victim and their mother as fact witnesses.

Notably, all cases were initially joined from their inception and remained together throughout the pre-trial process without complaint or request for severance by the defense. It was only in response to the prosecution's request to introduce evidence of previously reported abuse by the victims' sibling B.R. that any complaint regarding joinder had been raised prior to trial. Moreover, this Court properly informed the jury of its duty to separate and evaluate each offense related to each named victim of each case independently. Since confirmation of consolidation had constituted a reasonable exercise of trial court discretion, Appellant's claim failed due to lack of any arguable legal merit.

## II. Admission of evidence had constituted proper application of Pa.R.E. 404(b).

Within his Statement of Errors Appellant complained that "the trial court erred in granting the Commonwealth of Pennsylvania's Motion To Admit a prior bad act involving defendant Willie Lee Robinson and another individual named B.R." The admitted evidence at issue related to Appellant's repeated long term sexual and physical abuse of his biological daughter B.R. that had

-18-

occurred years earlier and at times reportedly commensurate with his abuse of the named victims Evel.R., Evet. R. and W.R. The trial testimony demonstrated that the discovery of the abuse of B.R. along with her siblings occurred as part of the investigation of the sexual abuse of her younger, pregnant and mentally challenged sister Evel.R.

In summary, in 1999 B.R., then age sixteen years, had disclosed to her high school drill team coach that she was being repeatedly sexually and physically abused by Appellant her biological father in concert with her mother. Those disclosures led to the Philadelphia arrests and criminal prosecution in Philadelphia of both Appellant and his wife Evelyn Robinson. B.R. had been removed from the defendants' home and had testified to the salient events at a preliminary hearing.

Because B.R. had also revealed her witnessing of Appellant's abuse of her siblings, counselors had gone to the Appellant's Philadelphia home that he had shared with his wife Evelyn Robinson and interviewed the other siblings. Each child denied being abused for fear of parental retaliation and being split up in foster homes. Subsequently B.R. refused to participate in the prosecution of both of her parents following exertion of influence from other adult relatives.

As a result, all criminal charges related to Appellant's concerted sexual abuse of B.R. were withdrawn at time of trial. During this instant trial, the named victims sadly recalled that once their parents returned to the home following the drop of charges related to B.R. the physical and sexual abuse of them continued unabated.

The Commonwealth filed a motion essentially seeking admission of B.R.'s testimony to report the patterns of sexual and physical abuse that had been committed upon her individually by both her parents between the ages of ten (10) years and sixteen (16) years of age. The pattern of behavior that she would report had been nearly identical to the abuses experienced by her

complainant siblings. B.R. was expected to testify as an eyewitness to many similar acts of abuse that had been committed against her siblings in their Philadelphia homes.

It was anticipated that she would reveal that the impetuous to her earlier disclosure stemmed from an incident where during which her parents attempted to force her to have sexual intercourse with her brother named victim W.R. Moreover, B.R. would confirm that her sister named victim Evel.R. had fully informed her that Appellant had been sexually abusing her as well and that both parents had tried to force her to have an abortion to hide his ongoing abuse of her. B.R. became her sister Evel.R.'s caretaker upon arrest of her parents.

Pennsylvania Rule of Evidence 404, as the codified version of long-standing common law announced by our appellate courts, became the operating vehicle that amply supported this Court's decision to permit B.R.'s trial testimony. The applicable sections of statute 225 Pa. Code § 404(b) specifically recite:

> *"(b)Crimes, Wrongs or Other Acts.*
> (1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> (2) *Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.
> In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice."

225 Pa. Code § 404. By generally outlining prohibited and permitted uses of evidence of a defendant's other crimes or wrongdoings, these sections have attempted to clarify long standing and often misinterpreted circumstances wherein relevant evidence of a defendant's behavior independent of the conduct for which he or she is on trial may be introduced to prove complicity.

The leading appellate cases proffered by the Commonwealth in the instant matters that had supplied common law guidance and statutory interpretation of 225 Pa. Code § 40, included

*Commonwealth v. Lark*, 543 A.2d 491, 497 (Pa.1988), *Commonwealth v. O'Brien*, 836 A.2d 966 (Pa.Super. 2003 and *Commonwealth v. Ardinger*, 839 A.2d 1143 (*). Analysis of those appellate decisions revealed repeated permission of evidence admission to establish a common plan, scheme and design and to defeat fabrication defenses.[6]

As applied to the instant matters, the reasonable proffer of admissibility was multi-fold. First, B.R.'s testimony regarding the methods by which her parents sexually and physically abused her, provided a clear picture of Appellant's common plan scheme and design to torture all of his biological minor children. B.R.'s description of Appellant's behavior particularly in concert with his wife and co-defendant Evelyn Robinson, reflected a nearly identical pattern of commission of crimes to those that had been inflicted upon her siblings. The points of commonality were inescapable.

All victims were the biological minor children of Appellant and his second wife and co-defendant Evelyn Robinson. All victims including B.R. reported being penetrated by Appellant's penis, either orally, anally or vaginally. All female victims including B.R reported being vaginally penetrated by Appellant's penis. All victims spoke of the corresponding threats and use of physical force exercised by both parents to gain their submission. B.R.'s report that she had been severely beaten by her father when she did not comply with her parents demands to have sex with her brother W.R. presented another intertwined ingredient.

All conduct perpetrated upon these victims repeatedly occurred roughly within the same time frames. Notably, each sibling including B.R. was an eyewitness to the abuse of her siblings. B.R. and the other victims consistently reported that all too often the children were collectively as well as individually forced to perform sexual acts with their parents and each other. The abuse for

---

[6] This Court adopted as sound, the legal analysis presented within the filed Commonwealth's Motion To Admit Other Acts/Crimes Evidence Pursuant to PA.R.E. 404(b).

each victim including B.R. started early and progressed during their early teen developmental years and continued unabated into early adulthood. The abhorrent conduct predominantly occurred within the confines of the residential walls of properties owned by Appellant in Philadelphia and certainly away from the prying eyes of the public.

Appellant's steadfast employment of the victims' biological mother, co-defendant, Evelyn Robinson both passively or actively, to promote his reign of terror was a unique feature repeatedly disclosed by all victims including B.R. Those significant cohesive components were confirmed by Evelyn Robinson both in her written statement of admission that she had provided to law enforcement in April of 2018 and during her trial testimony. Moreover, the similarity of B.R.'s experience with those of the named victims unequivocally demonstrated Appellant's malevolent purpose, plan and design to dominate his biological minor children sadistically as sexually playthings for his own immediate gratification.

This same evidence was employed by the prosecution to rebut Appellant's expected claim of collaborative fabrication or falsehood and to provide the fact-finding jury an accurate unabridged version of events as they had unfolded. B.R., like her siblings was not only a reporter of her strikingly similar experiences, she was an eyewitness to some of the atrocities perpetrated by Appellant that had been the subject matter of the instant offenses for which he had been deemed guilty. Thus, her testimony was intimately linked and necessary to provide the fact-finding jury an accurate, complete and chronological perspective. To exclude this evidence would have opened the door for Appellant's unfair sanitization and manipulation of events.

Indeed, as Appellant freely volunteered during the previous pre-trial colloquies conducted by this Court, his announced defense was one of collective fabrication. He rationalized that B.R. and Evet.R. had falsely created the allegations to gain access to the Social Security checks that had

-22-

been issued on behalf of Evel.R. due to her disabilities. Thus, B.R.'s testimony was essential for the jury to contextually evaluate her and her siblings' credibility. This evidence was also deemed relevant to explain the victims' delays in reporting.

B.R.'s testimony had been subjected to the same scrutiny through direct and cross-examination by counsel in front of the jury as the other fact witnesses. Appellant was provided full opportunity to confront this witness. The jury as fact-finder was provided a full and fair reflection of events and thus was able to assess B.R.'s credibility. Given the complexities involved with proving intrinsically private crimes, the probative value of B.R.'s testimony far outweighed any prejudicial impact. Appellant was not unduly prejudiced by the admission of the relevant crimes evidence as presented directly by B.R.

Moreover, this Court emphasized to the jury the limited purpose for which this evidence was introduced within the final instructions. This Court reiterated:

> "In this case, you heard evidence tending to prove that the defendant was guilty of improper conduct for which he is not on trial. I'm talking about the testimony introduced by B.R. that he sexually abused his daughter B.R. (deletion of full name added). This evidence is before you for a limited purpose and that is for the purpose of pose of tending to show a common plan, scheme, or design of the defendant, to show his state of mind and to rebut any claims of fabrication. That evidence must not be considered by you in any other way other than for the purpose I just stated to you. You must not regard this evidence as showing the defendant is a person of bad character or criminal tendencies for which he might he might be inclined to infer to guilt..."

(N.T. 04/08/2019 p.61) In light of all of the above-stated collective reasons, the decision to permit admission of this highly probative evidence for the limited purposes as instructed directly through presentation of examined testimony from B.R. constituted a reasonable exercise of trial court discretion.

-23-

## III. Sufficient evidence supported each conviction.

Appellant broadly contended in post-sentence motions and his appellate claims that all recorded jury verdicts of guilt in each of the above-captioned cases had not been sufficiently supported by competent evidence. To support these assertions as narrated within the Statement of Matters Complained of on Appeal, Appellant simply listed all convicted offenses as applied to each victim without identifying any perceived deficiency with respect to lack of proof of statutory elements.

Those broad claims miscarried because they had ignored the value of the recorded cumulative trial evidence and unduly discounted the jury's fact-finding duty that had been properly exercised following the receipt of final instructions provided by this Court. Final instructions included detailed explanations of each required element of each offense and the following reminder:

> "I cannot stress to you enough that I am not the judge of the facts. You are. It is your responsibility to weigh this evidence and from that evidence and the logical inferences that flow from that evidence to find the facts. In this matter, you will apply the rules of law that I give to you to the facts as you find them to decide whether or not this defendant has or has not been proven guilty beyond a reasonable doubt.
> In determining the facts, you are to consider only the evidence presented in this court and the logical inferences that flow from that evidence. You are not to rely upon supposition or guess about anything not in evidence that you find to be incredible even if uncontradicted."

(N.T. 04/08/2019 pgs. 48-49)

Further, the inferred allegation reliance upon the need for additional physical proof of injury or eyewitnesses to prove sexual assaults of any of the victims in this matter defied reality and existing law. By their very nature these types of crimes had been purposefully conducted in secret. This is the reason that our appellate courts have upheld provision of the standard jury instruction that had been imparted verbatim in this case as follows:

-24-

"In this case because off the nature, the testimony of Evel.R., W.R. and Evet.R each standing alone or in combination, if believed by you, is sufficient proof upon which the defendant-you may find the defendant guilty in this case. The testimony of the victim in a case such as this need not be supported by other evidence to sustain the conviction. Thus, you may find the defendant guilty if the testimony of Evel.R., W.R. and/or Evet.R convinces you beyond a reasonable doubt that the defendant is guilty."

(Id. at pgs. 60-61) See also Chapter 31. Section 3106 of the Crimes Code which specifically states in part, as follows: "The testimony of a complainant need not be corroborated in prosecutions under this chapter." (Act of May 18, 1976, P.L. 120, No. 53, as amended March 31, 1995, P.L. 985, No. 10, § 3106.)

In reviewing the sufficiency of evidence claims, an appellate court considers "whether the evidence presented at trial was sufficient to establish all elements of the crime beyond a reasonable doubt." *Commonwealth v. Burton*, 2 A.3d 598 (Pa. Super. 2010). The appellate court views all the evidence and reasonable inferences therefrom in a light most favorable to the Commonwealth as verdict winner. *Id.* Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail. *Id.* The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented." *Commonwealth v. Feliciano*, 2013 Pa. Super 117, 67 A.3d 19, *quoting Commonwealth v. Stokes*, 2011 Pa. Super 261, 38 A.3d 846, 853-854 (Pa. Super. 2011) (internal citations and quotations omitted).

The statutory elements of each offense had been properly provided by this Court to the jury separately as to each identified complainant within the final instructions provided to the jury. (Id. at pgs. 62-137). Naturally, following the more broadly based instructions, this Court supplied detailed directions concerning the integral essentials. Also, Appellant's potential liability for all

crimes as a co-conspirator and/or as an accomplice with his wife and named co-defendant Evelyn Robinson, was explained. This was followed by complete explanation of the required elements of the separate crime of Conspiracy as charged individually relative to each named victim. (Id. at pgs. 65-68, 88-91: re Conspiracy-Evel.R.; Id at pgs.107-111 re Conspiracy-Evet.R.; Id. at pgs. 125-129: re Conspiracy-W.R.) This Court repeatedly defined the necessary elements of overt acts coupled with the intent necessary to prove the charge of Conspiracy as applied to each victim separately.

Instructions were also given to guide the jury's consideration of the Evelyn Robinson's testimony with due caution. (Id. at pgs. 62-65) Within the final instructions, the statutory requirements for each charged offense were identified and clarified in order of charges listed on the verdict sheets that pertained to each of the three designated named victims. This Court reinforced the fact that "Each charge must be considered separately." (Id. at p. 70) Notably, no objections had been raised concerning this Court's final instructions upon completion.

As this Court stated, the statutory elements as independently applied to three victims Evel.R., Evet.R. and W.R., of Rape by Forcible Compulsion pursuant to 18 Pa.C.S.A. § 3121(c), required proof beyond a reasonable doubt that Appellant, either individually or in concert with Evelyn Robinson:

> "...had sexual intercourse by forcible compulsion or by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution. The force used or threatened can be physical force or violence but it does not have to be. It is legally possible for an individual to commit rape by using or threatening intellectual, moral, emotional or psychological force. Under our crimes code rape can be committed by a male or by a female upon a person of the same or opposite sex...."

(Id. at pgs.75-78: re victim Evel.R.; Id. at pgs. 115-119: re victim W.R.) [7]

---

[7] Incorporate Footnote 1; and note:

As to Involuntary Deviate Sexual Intercourse by Forcible Compulsion, 18 §3123 §§ A1, graded as a first-degree felony, which pertained to victims Evet.R. and W.R. and Attempt-Involuntary Deviate Sexual Intercourse by Forcible Compulsion, 18 §3123 §§ A1, F1 as it related to victim Evel.R., the statutory elements as properly conveyed by this Court to the jury, were equally straightforward. As this Court stated:

> "A person commits the crime of involuntary deviate sexual intercourse with another person of the same or opposite sex by forcible compulsion or by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution. The force used or threatened can be physical force but it does not have to be. It is legally possible to commit rape by using or threatening intellectual, moral, emotional or psychological fore. The defendant is charged with this crime. To find the defendant guilty of this offense you must find that the following elements have been proven guilty beyond a reasonable doubt: The defendant engaged in deviate sexual intercourse by force or threat of force, the threat being the kind of threat that would have prevented a reasonable person faced with the same circumstances present here from resisting. Now deviate sexual intercourse has a particular meaning. A deviate---I do not mean to place a value judgement like deviant, okay, that's not the same thing. Deviate sexual intercourse occurs if a man's penis penetrates the mouth or anus of a person or if a person's tongue penetrates the sexual organ of a woman. Deviate sexual intercourse also occurs if

---

The transcribed notes of testimony reflected that the Commonwealth had from the inception prosecuted Appellant for **Rape by Forcible Compulsion, 18 § 3121 §§ 1** as a felony of the first degree in each of the above-captioned matters. The record formally reflected that this Court permitted the Commonwealth to amend the charging bills of information just before trial on April 2, 2019 without defense objection to add the general charge of **Conspiracy-Rape Forcible Compulsion, 18 §903,** graded as a Felony of the First Degree in each of the above-captioned cases without objection which resulted in the inclusion of Count 13 of the case docketed under **CP-51-CR-0001796-2018** that identified Appellant's daughter **Evet.R** as victim. Appellant was formally arraigned before the jury to the general announced charges of Rape and Conspiracy. The trial proceeded and the jury had been instructed consistently with the charges of **Count 2: Rape by Forcible Compulsion, 18 § 3121 §§ 1, F1** and **Count 13: Conspiracy-Rape Forcible Compulsion, 18 §903, F1.**

Notably, the charge of **Conspiracy-Rape Forcible Compulsion, 18 §903,** graded as a Felony of the First Degree requires proof of force or threat of force to be exerted upon the victim. The charge of Rape of a Child pursuant to 18 Pa.C.S.A. § 3121(c) graded as a first-degree felony, does not require proof of force or threat of force. It simply requires proof beyond a reasonable doubt "that the adult person engaged in sexual intercourse with a minor person of the same or opposite sex who was less than thirteen (13) years old. 18 Pa.C.S.A. § 3121(c)." In the instant case, the Commonwealth had abundantly demonstrated that Appellant had individually and in concert with his wife exerted force and threat of force upon Evet.R at least as early as twelve years old to have sexual intercourse vaginally and anally with Appellant. Thus, the scrivener's error and coding of the sentences before correction had resulted in no prejudice to Appellant. Thus, this Court has cured a harmless error that had not been noticed by anyone.

-27-

the person uses a physical object, not part of his or her body, to penetrate the anus of another person or the sexual organ of another woman or any purpose other than good faith, medical, hygienic or law enforcement purposes.

For all forms of deviate sexual intercourse, the slightest degree of penetration is sufficient. No emission (spelling corrected) of semen. ..."

(Id. at pgs. 78-80, 96-98, 99-101, 116-120)

As to all sexual offenses, this Court had defined the term "sexual intercourse" consistently with the applicable statutes and interpreting case laws. As explained, "the term "sexual intercourse" included not only vaginal sex, but also "intercourse *per os or per anus*, with some penetration however slight; additionally, "emission is not required."18 Pa. Cons. Stat. Ann. § 3101. The term "sexual intercourse" also included penetration, however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures." 18 Pa.C.S.A. § 3101; see also *Commonwealth v. Kelley*, 569 Pa. 179, 801 A.2d 551, 555 (Pa. 2002), citing *Commonwealth v. Lee*, 432 Pa. Super. 414, 638 A.2d 1006 (Pa. Super. 1994), appeal denied, 538 Pa. 643, 647 A.2d 898 (Pa. 1994) (interpreting sexual intercourse and deviate sexual intercourse to include acts of oral and anal sex).

Intercourse was defined in each version of the sexual offenses, as requiring proof of penetration, "however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures." 18 Pa.C.S.A. § 3101; see also *Commonwealth v. Kelley*, 569 Pa. 179, 801 A.2d 551, 555 (Pa. 2002), citing *Commonwealth v. Lee*, 432 Pa. Super. 414, 638 A.2d 1006 (Pa. Super. 1994), appeal denied, 538 Pa. 643, 647 A.2d 898 (Pa. 1994) (interpreting sexual intercourse and deviate sexual intercourse to include acts of oral and anal sex). (Id. at pgs. 74-77,79-80, 96-97)

The offense of Aggravated Indecent Assault-Without Consent, 18 § 3125 §§ 1, graded as a Felony of the Second Degree as applied to female victims Evet.R. and her sister Evel.R. was defined for the jury as follows:

"...To find the defendant guilty of this offense you must find that the defendant penetrated Evet.R. (omitted full name) ...You must find the defendant penetrated, however slightly, the genitals of another person with the defendant's finger or other body part. The other person is Evet.R. Second, the defendant did not do so for good faith, medical, hygienic or law enforcement purposes. And third, that Evet.R. did not consent to the penetration. Fourth, the defendant acted knowingly or recklessly regarding Evet.R.'s non-consent. A person acts recklessly with respect to the alleged victim's non-consent if he conspicuously disregards a substantial and unjustifiable risk that the victim is not consenting to the penetration. The risk disregarded must be the sort of risk that is grossly unreasonable for the defendant to disregard.
As to the fourth element the defendant acted knowingly or at least recklessly with regard to alleged victim's non-consent if he consciously disregards a substantial and unjustifiable risk that the victim is not consenting to the penetration. The risk disregarded must be the sort of risk that is grossly unreasonable for the defendant to disregard."

(Id. at pgs.101-104-re Evet.R.; pgs. 83-86-re Evel.R.)

As to the charge of Incest as it related to all three victims, this Court instructed as follows:

"...To find the defendant guilty of this offense you must find that the two elements have been proven beyond a reasonable doubt: First, the defendant had sexual intercourse with Evet.R., his descendant of whole or half blood. These relationships include blood relationships without regard to legitimacy, relationship with parent and child by adoption; Second, that the act of sexual intercourse with the defendant's knowledge he knew that his partner was his descendant. (sp.) If after considering all the evidence you find that the Commonwealth has established beyond a reasonable doubt the elements, I've just stated you should find the defendant guilty of incest. Otherwise, you must find the defendant not guilty."

(Id. at pgs.104-106-victim Evet.R.; and pgs. 85-88-victim Evel.R.; and pgs. 122-124-victim W.R.)

Concerning the nonsexual offense of Aggravated Assault, 18 § 2702 §§ A, graded as a felony of the first degree to which the jury found Appellant guilty of committing upon the two victims Evet.R. and her brother W.R., the statutory elements along with the clarifying question concerning the infliction of serious bodily injury were provided as follows:

-29-

"... On all counts of aggravated assault, you're going to see underneath aggravated assault there is a question: Was serious bodily injury caused? That question has to be answered yes or no as it relates to each individual complainant, okay. That's because the aggravated assault that I'm defining for you includes attempt to cause or cause, so that has to be answered.

Aggravated assault, attempt to cause serious bodily injury or cause serious bodily injury to Evet.R. The defendant is charged with aggravated assault, attempt serious bodily injury. To find the defendant guilty of this offense you must find the following elements proven beyond a reasonable doubt: First, that the defendant attempted to cause serious bodily injury to Evet.R. What's serious bodily injury? It means bodily injury that creates a substantial risk of death or that would cause serious permanent disfigurement or protracted loss of any bodily member or organ. In order to find the dependent attempted to do this to Evet. R. you must find that the engaged in conduct that constituted a step towards serious bodily injury to Evet.R. And second, the defendant's conduct in this regard was intentional. In other words, that it was his object or purpose to cause such serious bodily injury. It is important to understand how these two elements relate to each other to assess whether or not they have been proven beyond a reasonable doubt.

In proving this version of the count of aggravated assault, the Commonwealth need not prove that serious bodily injury was actually inflicted upon the alleged victim, Evet.R.. The Commonwealth must prove, however the defendant took an action, that is a substantial step of such a nature and degree that there is no reasonable doubt that it was his conscious object or purpose to cause such a life threatening injury to the alleged victim, Evet.R

To make sure this determination you may find it useful to ask why the alleged victim did not actually suffer serious bodily injury as a result of the incident at issue. If you find that such injury did not occur only because of something outside of the control of the defendant such as intervention of third party or parties to stop the attack, the ability of the victim to avoid the full brunt of the attack or prompt administration of medical attention that would prevent injury from developing into the kind that would suit the definition of serious bodily injury then you may consider that as evidence to whether the defendant's substantial step was done with the intent necessary to support a verdict on this count. However, any particular action by a defendant, although serious in of itself, may not be sufficient evidence from which you may find the defendant intended to cause serious bodily injury. This is because any such action may also be evidence of a less serious outcome actually intended by the defendant such as to scare the victim or cause les serious injury. It is only after consideration of all the evidence that you conclude beyond a reasonable doubt that the defendant's action was a substantial step in a chain of events he consciously set in motion with the intended result being that alleged victim, Evet.R., would actually suffer serious bodily injury then you should find him guilty of this count. Otherwise, you should find the defendant not guilty of aggravated assault.

As to aggravated assault causing serios bodily injury, in order to find the defendant guilty of this version of the vents, you must find each of the following elements proven beyond a reasonable doubt: First, the defendant caused serious

bodily injury to Evet.R. Again, serious bodily injury is bodily injury is bodily injury that will create a substantial risk of death or that causes a serious permanent loss or impairment or protracted loss or impairment of the function of any bodily member (or) organ. And second, the defendant acted intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life. The person acts intentionally with respect to serious bodily injury when it is his conscious object r purpose to cause such injury. A person acts knowingly with respect to serious bodily injury when he's aware it's practically certain his conduct will cause such a result. A person acts reckless with respect to serious bodily injury when he consciously disregards a substantial and unjustifiable risk that serious bodily injury will result from his conduct. That risk must be of such a nature and degree considering the nature an intent of the defendant's conduct and circumstances known to him, (the) disregard involves gross deviation from the standard of conduct that a reasonable person would observe in the defendant's situation. It is shown by the kind of reckless conduct from which life-threatening injury is almost certain to occur."

(Id. at pgs. 91-96-victim Evet.R.; Id. at pgs. 111-115-victim W.R.)

Last but not least, it should be noted that Appellant had generally alleged in his Statement of Errors, that the evidence was insufficient to find him guilty of the third-degree felony graded offense of Endangering Welfare of Children-Parent/Guardian/Other Commits Offense pursuant to 18 Pa.C.S.A. § 4304 §§ A1 separately related to all victims. This offense is statutorily defined: "[a] parent, guardian, or other person supervising the welfare of a child under 18 years of age.... commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S.A. § 4304.

As this Court consistently informed the jury, conviction of Appellant for this offense this required proof beyond a reasonable doubt: 1) the accused was aware of his or her duty to protect the child; 2) the accused was aware that the child was in circumstances that could threaten the child's physical or psychological welfare; and 3) the accused had either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare. See also *Commonwealth v. Pahel*, 456 Pa. Super. 159, 689 A.2d 963, 964 (Pa. Super. 1997), citing *Commonwealth v. Cardwell*, 357 Pa. Super. 38, 515 A.2d 311, 315 (Pa. Super. 1986).

In the instant matter, the Commonwealth of Pennsylvania had easily proven to the jury's fact-finding satisfaction that Appellant had abused his adult guardianship authority as supervising parent of his biological children to facilitate his continuing criminal course of conduct that harmed them physically and mentally. His repetitive beatings of them alone certainly endangered their physical and mental well-being. Clearly, Appellant had repeatedly violated his statutory attributed duty of care toward each child. These acts also provided corroborating proof of his continuing course of criminal conduct.

The statutory elements of three counts of Endangering Welfare of Child as A Course of Conduct were provided separately per victim. The jury was also provided with additional explanation upon request in response to juror questions that had been posed during deliberations. The statutory elements were recited as follows:

> "...To find this defendant guilty of this offense you must find each of the following four elements proven beyond a reasonable doubt: One, that the defendant engaged in a course of conduct of endangering the welfare of the child, W.R. (full name deleted), by violating a duty of care, protection or support. A course of conduct means a pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct. Second, that the defendant endangered the welfare of the child, W.R., knowingly. A person's conduct is knowing when he's aware that this (it) is certain (to) cause a particular result. Third, the defendant at the time was a parent, guardian or a person supervising the welfare of a child under the age of 18 or a person then employs or supervises such person. The term person supervising the welfare of a child means a person other than a parent or guardian that provides care, education, training or control of a child. Fourth, that the child, W.R., was under the age of 18 years at the time the endangering conduct occurred.
> If after considering all of the evidence that you find that the Commonwealth has established beyond a reasonable doubt the elements that I've sated to you then you must find the defendant guilty of endangering the welfare of a child, W.R. then you must find the defendant guilty of endangering the welfare of a child, W.R.,. Otherwise, you must find the defendant not guilty."

(Id. at pgs. 122-125-victim W.R.; pgs. 85-88-victim Evel.R.; pgs. 105-107-victim Evet. R.)

Credible and compelling direct and circumstantial cumulative evidence introduced at trial unequivocally proved each crime for which Appellant had been convicted. The graphic recollections of each victim demonstrated not only the harm inflicted upon each individual but also corroborated the reported experiences of all siblings. The testimony of cooperating co-defendant Evelyn Robinson uniquely illuminated Appellant's conspiratorial criminal conduct and corroborated the victims' accounts of Appellant's sexual, physical and mental acts of torture that comported with the respective statutory elements of each crime charged.

The Commonwealth's case began with trial testimony from Guy DeRitis, the Adult Protective Services investigator contracted by the City of Philadelphia Department of Human Services and who specialized in investigation of reports of abuse of adults with disabilities. Mr. DeRitis responded to the report of allegations of sexual abuse and related health concerns raised by medical personnel at Jefferson Hospital on December 16, 2017 during their emergency room treatment of then pregnant victim Evel.R. (N.T. 04/03/2020, pgs. 38-40)

Upon arrival and after subsequently interviewing the sources of this abuse report, Mr. DeRitis contacted Evel.R.'s older sister B.R. by telephone on or about December 18, 2017. B.R. informed him that Evel.R. had disclosed that her parents were trying to force her to abort her baby against her will to hide Appellant's ongoing rapes of her in the family home. B.R. also disclosed to Mr. DeRitis that she "was a victim of sexual abuse at the hands of her father as a child and a teenager." (Id. at p. 45) Mr. DeRitis also spoke to victim Evet.R, who confirmed the concern for Evel.R. and who "also disclosed that she was a victim of sexual abuse as a child and teenager at the hands of her father." (Id. at p. 46) In the interim days, Appellant and his wife Evelyn Robinson removed Evel.R. from Jefferson Hospital which heightened concern for her safety.

-33-

Based upon the corroborating data received, Mr. DeRitis went to the residence located at 4549 Hurley Street, Philadelphia PA on December 20, 2017. Outside the home he spoke privately with victim Evel.R. and conducted a verbal short portable mental test which confirmed her mental disability. During this short conversation the victim's mother Evelyn Robinson kept coming to the door and looking out of the home window and Evet.R. reacted nervously. Mr. DeRitis testified:

> "After I kind of gauged where she was, I began to just ask her questions about the information that I received and that's when she told me--- well, first I should say that she was visibly pregnant. Information that I received was that she was approximately 20 weeks pregnant and it was very obvious, you could see it. I asked her about the allegations and that's when she told me that since she was a young child, she believes it might have started at the age of 14, she was having sexual relations with her father. She said that he would come into her room and he would touch her on her private parts and he would have her place his penis in her mouth. She also told me that in addition to that they would have sexual relations."

(Id. at p. 51) Evel.R. explained that the sexual abuse was still ongoing. She became so nervous about speaking as she noticed her mother watching that she stopped speaking. Mr. DeRitis had introduced himself as a social worker just following up from Jefferson Hospital to prevent reprisal. (Id. at pgs. 52-53)

Based upon his interviews and fearing immediate harm, Mr. DeRitis went to the Special Victims Unit of the Philadelphia Police Department and reported his findings to assigned Detective Linda Blowes along with Evet.R. and B.R. Members of the Philadelphia police department and social services and Evel.R.'s two sisters were dispatched with Robinson's home. Evel.R., as was her stated wish, was removed from the residence, placed in the care of her sister B.R., and then provided a formal compelling statement during investigators. Despite her mental difficulties Evel.R. singularly and consistently provided more details concerning the physical and sexual abuse that she had endured from her parents over a period of years since she was a very young child. Mr. DeRitis observed the interview on closed circuit television. (Id. at pgs. 57-60)

B.R. then testified to the genealogical history of this family, provided a summarized timeline of events corresponding to the respective Philadelphia addresses where the sexual and physical assaults had taken place. (Id. at pgs. 83-85) She stated that she had been living with her parents until fifteen (15) or sixteen (16) years old when she had disclosed to her drill team instructor that she could not return home because of what her father had forced her to do. This school official reported to the City of Philadelphia Department of Human Service who removed her from the home and placed her in a group home. She stated that she never returned to live with them once removed. (Id. at pgs. 86-88)

B.R. testified that both of her parents had been criminally prosecuted after she had provided interviews. She remembered testifying at court early on in the process. She recalled that she did not go back to court "Because when I was going to school, I got off the 33 bus. My mother and father brought my oldest brother down to the school to convince me to drop the case." (Id at p. 88)

B.R. vividly recounted that the sexual abuse of her by both parents began when she was in kindergarten. She recalled:

> "I was in Kindergarten. I can remember going to school every single day. I...My mother and father was like doing it and he was just sitting there watching..." went to school every single day. I never wanted to stay out of school. This one day I was in Kindergarten they kept me home—and this was 5472 New Place. We had a refrigerator and somebody stole the cake off the refrigerator so they were trying to figure out who did it and I know I didn't do it. They were like oh, she put the table up the refrigerator to get it, so they were trying to make me show them how I went up to the cake and I was like I didn't do it. They kept me home, just me, and that's when they started like using dildos. There was a white one, a black one that had two heads and they were using it to fondle me with it but they never penetrated. They just like fondled me with it and that was it."

(Id. at pgs. 88-89) Before speaking to the progression from fondling to the myriad forms of oral, penile and vaginal penetration and sexual abuse methods to which she became routinely subjected to by both biological parents over multiple years, B.R. shared with the jury the pivotal experiences

-35-

that caused her to disclose the abuse to school personnel at the age of fifteen (15) years old as follows:

> "the very memory that actually made me go out and like physically tell somebody because when you're in it you don't know that it's wrong or that something is going on because you are in it and you don't know that it's wrong because you are there. So it was like I was in middle school ion the DARE program. I don't know if you guys know that, but the DARE program came out and the police officers were like telling me if somebody do this to you let us know. In my mind I was like this is wrong. I have to get out of this. This is not right.
>
> This one day they brought me down to their bedroom. My mother and father were like coming down to the bedroom. When I went to the bedroom one of my brothers was in the bedroom and I'm like what is this about, He physically wanted me to give my brother a blowjob so I was like no, I'm not doing it. He physically took his fist and he punched me in my face because I wouldn't do it. I said I don't care how many times you hit me I'm not doing it. He kept trying to punch me on the side of my head and I still was just sitting there.
>
> After I refused to do it, they made me get dressed. When I got dressed, I went to 4258 North Reese Street. They put me in the car and took me to that address. It was a pullout couch because I didn't want to pretty much give my brother head.... My father...So my father raped me on the pullout couch because I didn't want to have sex with my brother or give my brother like oral sex"

(Id. at pgs. 88-91)

During that same portion of the testimony, B.R. identified the brother "Bil.R." that was forced to take his clothes off and chosen by her parents to have sex with her. B.R. vividly recalled her brother avoid trying to avoid his father's demand to remove his clothing. She said "He told him to remove his clothes because I was saying no, no, I'm not going to do it. He didn't even attempt to pull his pants down, ..." (Id. at pgs. 94-95)

B.R. disclosed continued complicity of her mother as she laid along the side in the same couch while her father was raping her vaginally with his penis. In fact, B.R. could not recall any incident wherein her mother was not, at least present during the sexual assaults. She remembered that her mother often participated in the sexual assaults by massaging her vagina with Vaseline

-36-

and Blue Magic hair grease to employ sex toys to facilitate easier vaginal penetration by Appellant's penis.

B.R. testified that she had been forced to perform vaginal and oral sex upon her father sex too many times too count throughout the years beginning around the age of five or six years old until she finally reported the abuse at age fifteen. (Id. at pgs. 99-101) She also provided to the jury the awareness that she and her siblings had shared of each being forced to submit to Appellant's predatory behavior. During her testimony she had explained:

> "...It was like constant. He thought we were his girlfriends. We'll walk past him and he'll squeeze your boob or rub your bottom or hit you in your butt. You were his girlfriend in replace of my mother...

(Id. at p. 96)
> ...Depending on him because if he had one of my older sisters Evet.R., she'll come up from the room ad she'll say daddy wants you. Even if she come upstairs and we downstairs we already know what's it's about. He wanted us...

(Id at p.100)
> ...I knew it but we never like said like what happened to you when you went in and well, what happened to you. We didn't talk about it. We already knew something happened. It was a shame so we didn't –we kept it to ourselves but we knew that once you came up and got us and said daddy wants us. We already knew what that meant..."

(Id at p. 101)

After providing to the jury a recitation of Appellant's concerted systematic forms of abuse that had born striking similarities to the patterned attacks upon her siblings, B.R. provided the fact-finding jury a corroborating timeline and explained events that led to arrest of Appellant and their mother Evelyn Robinson. She also testified as to the concerted intimidation form that she had sustained when she had originally reported and testified against her parents, years earlier and the detrimental silencing effect that it had upon her younger siblings who became the named victims in the three instant cases. B.R. corroborated Mr. DeRitis' testimony at to the sequence of final

events. She confirmed that her sister Evel.R. had disclosed to her that she was most fearful because her parents had been forcing her to have an abortion to hide the fact that her father had been routinely raping her. Id. at pgs. 104-10)

Just like his siblings, W.R., now an adult, identified Appellant and Evelyn Robinson as his biological parents. He began by stating that his childhood and his relationship with his father had been "rough." When asked to explain his meaning "Like every night you had to do stuff with each other." (Id. at p. 145) W.R. recalled an early memory of his father's sexual abuse at age sixteen (16) years when he was "touched" on his private part while they lived in West Philadelphia. He stated that his parents were laying naked on their bed in their bedroom on their bed watching "porno" on the television when his father told him to take off his clothes.

His mother began playing and "jerking" his penis with his penis and jerking it while his father watched and "told her to do it." (Id. at pgs.145-148) W.R. recalled that "Well, my dad told my mother to jerk me off, get me hard. Then once it got hard, he told me lay on the bed. I had laid between both of them and then she still kept doing it and he told me to get on top of my mom." (Id. at p. 148) Once he became hard his father told him to put his penis inside his mother as she lay on her back and move inside her in and out while his father was "jerking himself off." (Id. at p.150) W.R. tearfully testified that he and his mother had been crying during this assault. He also remembered that he had been forced to have sexual intercourse with his mother multiple times by his father thereafter.

When asked to recall another memory, W.R. spoke about being awakened in the middle of the night and being told to come into his parents' bedroom where he saw his mother, his sister and his father all naked in the bed when they lived in North Philadelphia. There he was forced to have sexual intercourse with his sister Evel.R. and watch helplessly as his father also had sexual

-38-

intercourse with his sister after him. He vividly recounted how much Evel.R. had sobbed uncontrollably. W.R. said that he and his sister had discussed what had happened the next day and about how scared of his father he had been. (Id. at pgs. 152-155)

When asked to explain the basis of his fear of his father, W.R. spoke of how his father had often threatened him, handcuffed him and his siblings to a banister and repeatedly beaten him and forcibly raped and sodomized him. (Id. at pgs. 155-157) W.R. described at least one occasion when "He said I had to, you know, sleep with my mom again and one time I didn't do it and we had these rubber weights and he hit me in my head with it" Afterwards he was forced to insert his penis in his mother's vagina and then insert his penis inside his father's "butt" after his mother lubricated him.

W.R. recounted the times when his father and mother would "play with him." Notably his mother was always with his father when he was assaulted. As to the times W.R. disclosed that his mother would perform oral sex on him, he specified that his mother always acted according to his father's direction. W.R. testified that when he was sixteen (16) or seventeen (17) years old when they were living in West Philly:

> "...he came got me out the room and I had to go in his room and he had my mom play with me and I had to go on the other side and that's when he put his mouth on my penis...I had to stand still and he had his hand on it and put it in his mouth."

(Id. at p. 161)

As to the physical assaults, W.R. recalled that inside their house his father would strip them and "had us all stand on the second steps before you get to the downstairs and it's like a hallway and we all had to stand in line...It was me, Evet.R., B.R., Wi.R., Bil.R.., and that was it....he had us all stand there and everybody was taking turns getting beat by the water hose." (Id. at pgs. 163-164) He testified that everyone's clothes were off as they were struck. He described the water hose

-39-

as a a cut outside garden hose. He said had felt burning pain, bled and was unable to pee after being repeatedly struck by Appellant with the hose in "my whole front and my private." Id. at pgs. 163-165)

When the prosecutor inquired if he had remembered seeing anything happen to Evet.R., W.R. responded that he when he was thirteen (13) or fourteen (14) years old, he had seen Evet.R going into their dad's room at night. When asked about B.R., he just recalled that she had gone to school one day and then never returned. He said:

> "...that one time she said I could wear her sneakers because I had gym and we went to school and everybody was sitting there asking where is. She never came back home and then some people came to the house asking questions and then they got like—my father and mother got locked up and they came back couple months later I guess. B.R. never told me what happened. I never seen my sister again."

(Id. at pgs. 166-167)

When a pivotal question was asked by the prosecutor as to whether he had told the police or anyone when B.R. had left about what was happening to him, W.R responded similarly to B.R. that "No, I was scared. We were all scared we were going to get split up and we wanted to stay with each other." (Id. at p. 167) When asked when the abuse had stopped, he stated about the age of twenty (20) or twenty-one (21) years, he was kicked out of his home by Appellant and went to live in a mission shelter until his older sister allowed him to stay with her. When he left, Evel.R. remained living alone with their parents. (Id. at pgs. 166-168)

W.R. also briefly disclosed the significant impact that years of abuse had upon his life. He said that he was "scared now to talk to people. I wake up with wet sheets, cold sweats. I don't sleep like normal people. I got Advil p.m. because I can't go straight to sleep like everybody else." (Id. at pgs. 171-172) During cross-examination defense counsel explored the readily admitted fact that W.R. had an open bench warrant for failing to come to court for a pending retail theft matter.

When defense counsel inquired about timelines, W.R. was unclear and confused as to his age but he had recalled that the abuse began when he was in the fourth or fifth grade.

Summarily, defense counsel's cross-examination of W.R. cemented the credible and compelling basis for the deep-seated fear that W.R. had of his father. W.R. responded to repeated inquiry that "he would beat and hit me." (Id at p. 180) When asked what would was used to hit him, W.R. testified quietly and tearfully "I was scared of the hose. I didn't want to get hit and he hit me with the sand block weight and he hit me with his hands." As to resulting injuries, W.R. stated that that his private parts had been swollen and bruised after the beatings. He testified: "Sometimes I couldn't go to school because I was bleeding when I had to go to the bathroom." (Id. at pgs. 180-181) As to the inquiry concerning when he had been hit with the rubber weight filled with sand, W.R. explained that the attack left bruises and a long-lasting headache. W.R. acknowledged that no medical treatment was ever sought by his parents for his multiple injuries.

As to questions vis-à-vis the discussions between the victim siblings and their overall awareness of their parents' abuse, W.R. said that he had talked with his sisters about the abuse and whether to reveal anything to authorities when his parents were arrested following B.R.'s disclosure. Later he remembered talking to his sister Evet.R. more intensely after he left the home. Earlier he stated all of the children knew what was happening to each of them. (Id. at pgs. 184-187) Finally upon redirect W.R. reported that he would often see Appellant beat his mother. When defense counsel asked why he didn't report anything even after being put out of the house, W.R. revealed that he was still afraid of his father. (Id. at pgs. 179-181)

Evet.R. testified before the jury on April 4, 2019. She began with further explanation of the chronological order and ages of the victims at issue. Evet.R. provided more details as to the changes of Philadelphia residences occupied by her family. Evet.R. remembered that around the

age of twelve (12) years of age while she was attending Daroff elementary school, "stuff only happened at night." (N.T. 04/04/2019 pgs. 4-8) When asked to take the jury though her early memories, she testified:

> "It was so long ago but I can remember. We weren't allowed to come outside. We went to school and we would come home and then it was like when we were asleep we would get waken out of our sleep so it was rough to get ourselves together for school-to go to school...The way we was woken up was we were always stumbling with our days to get to school on time because of how our night went. Our night was kind of rough when you're getting something taken from you that you didn't expect to get taken. It was shocking because that's our father, you know. We would get woken up like dad wants you by our siblings and dad wants you to come downstairs. We're like for what, I don't know, he just wants you to come down. He'll come up and wake you up and you got to go downstairs. ...My dad always---he would wake us up. Once we come downstairs, he takes us and lead us into the room and we would take our clothes off...They have us in there he'll have Evelyn Robinson prep us and get ready for him, Willie Robinson...
>
> He would make my mom get up, Evelyn Robinson, and take me to the bathroom on the second floor near his bedroom. She cleans us up, bathes us, lipstick, you know, make us look older as I don't know as he wants us to look, and then we go into his room and then we lay on his bed and that's when he starts all of the sexual acts..."

(Id. at pgs. 8-12) [8]

Like her siblings, B.R. and W.R., Evet.R. remarked that their father had always employed their mother to facilitate his abuse of each of them. She graphically described forced repetitive sexual acts upon her which included his penile penetrations of her vagina. He had also directed her mother to use sexual toys like dildos as part of "prepping process." She similarly spoke of her mom performing oral sex upon her vagina every time to ready her body for her father's penile penetration. Evet.R. stated that her mother's mouth would be on her vagina and "in between her vagina to my vagina...I would be laid out straight on my back with my legs spread apart...." Her

---

[8] Evet.R. explained that she and her sisters B.R. and Evel.R. had shared a bedroom on third floor of the residence while their parents shared a bedroom on the second floor.

mother would be placed in between my leg" while he was watching and directing her..." (Id. at pgs. 11-14)

Evet.R. also recalled being routinely forced over the years by her father to perform oral sex and to engage in other sexual acts upon her mother each time just prior to his penile penetration of her vagina. She described one of those times as follows:

> "It was time when my father called me downstairs and she was on the couch, my mom, Evelyn Robinson, had her clothes off and called me downstairs to my room, the third-floor front. I come downstairs and he then would tell me to get on my knees and my mom was laying with her legs open. I get on my knees and applied oral sex on her and my dad was sitting right there in the chair, my dad, Willie Lee Robinson."

(Id. at p. 16)

As to the utilization of sex toys, Evet.R. described the same dildos as those recited by B.R. She said, "It was two headed dildo. It was long and jet black and the other one it was white, one short with two balls on the front of it." Just like B.R. and W.R., Evet.R. spoke haltingly and tearfully when testifying about being forced to perform sex acts including having intercourse with her siblings at different times. She stated "At the time it would be either me and my parents or he'll get another sibling to come downstairs and be into it with us. What I mean by that is W.R, Bil.R. or my brother W.R. Jr. would come, the one in North Carolina." (Id. at p.14)

Evet.R. provided detailed recollections of being forced to perform oral sex upon her father by placing her mouth on his penis while he moved her head up and down even moments before he would insert his penis into her vagina and then routinely withdraw his penis just before ejaculation upon her legs. (Id. at pgs. 17-19) Evet.R. also gave insight into Appellant's predatory methods that ultimately led to his arrest. Evet.R. stated that her father had encouraged her at a very young age to engage in sexual intercourse with her boyfriend to disguise his potential paternity of any future

-43-

pregnancies. Indeed, when she first became pregnant at the age of fifteen (15) or sixteen (16) years old, he considered himself to be the father. (Id at pgs. 17-20)

"When asked to recount her repelling of Appellant's attempts to have anal intercourse with her which precipitated her being thrown out of the family home with her two children, Evet.R. said that when they were living at 4258 N. Reese Street she was about twenty-one years old. She reported that she was in the bathroom getting ready for work, when her

> "father, Willie Lee Robinson, came into the bathroom and put himself behind me and he was trying to in the back and that's when I was like where this come from; so my reaction was to throw him off of me; then when I was done that is when he threw me out of the house with my daughters.... He was trying to force it in...The way he was tugging and trying to get ready, like he was trying to get himself together and still trying to get in the back but I was like fighting him."

(Id. at pgs. 21-24)

Particularly jolting was Evet.R.'s raw testimony concerning Appellants random acts of physical violence committed upon seven of his children including Evet.R., Evel.R., B.R., W.R. and their other full and half-siblings. She stated:

> "...he will call us downstairs, not one but all seven or sometimes six... He would make us all take off our clothes off and line up in a straight line and he'll take his time beating each and every one of us between our legs. The extension cord and the water hose...It would hit our private areas...It hurt because once it cut open he would throw salt on the wounds...All depends how his day was..."

(Id. at 25-26)

When the prosecutor inquired about victim W.R. specifically, Evet.R. replied that "he beat W.R. so bad that he bust his penis open and we had to put him in a tub with ice and water and try to calm the pain down... He had to be 14." (Id at pgs. 25-26) When asked about her mother's participation, Evet.R. responded that "She would be trying to stop him and he would whip her..." (Id. at pgs. 26-27) Like W.R., Evet.R. remarked that after these beatings, no one take them to the

-44-

doctors for treatment of their wounds. She said that at times they were force to miss school to avoid detection of injuries.

When inquiry was made concerning her nondisclosure of abuse, Evet.R testified that Appellant had often threatened to kill them with one of the guns that he had in his bedroom. Evet.R. stated he would say:

> "...If you tell anyone what goes on in this house, I will kill you. He always threaten to kill you even when he beat my mom real bad that he will kill her or if she die I'll kill all your kids and we always were scared like wake up mom, wake up. We tried to tell her to get up because if she died, he'll kill us too."

(Id. at p. 28) As Evet.R. recited facts that reflected her mother's concerted complicity, she illuminated her father's cruelty when asked about the guns kept in his bedroom. She stated:

> "No. It was more than one. My mom even pulled it one time when he was trying to beat her up. She pulled the gun and he grabbed my brother "Ch.R." when he was in a diaper. He had to be like two years old, like go ahead and shoot because you'll shoot your own son and he put him up to the door."

(Id. at pgs. 28-29.)

When the prosecutor asked Evet.R. whether she had felt safe to tell people like her friends or school teachers, Evet.R.. responded negatively and informed the jury of at least one occasion when her younger brother Bil.R. had told his teacher that he had not eaten dinner from the prior night as well no breakfast from that morning. She said,

> "...His teacher contacted his parents. When his parents picked up her brother at school, they made him eat to a point that he couldn't eat no more and they force him and beat him and made him hold books. He had a whole bunch of books, a jack—a big carjack. He had to hold it all because he went to school and told them he didn't eat and he was telling the truth. If they get into a fight my mom couldn't even see to make us anything to eat but if you go to school and tell anything you will get beat for that. So, no we didn't tell anyone."

(Id. at pgs. 29-30)

Evet.R.'s stated memory of the repercussions to her and her siblings, when her sister B.R. had disclosed the abuse by her parents to investigative personnel illuminated the pervasive fear that each victim had of Appellant. She said:

> "Yeah. Me and her--we were always trying to plan a way to make it out but at the time I had a daughter so I'm like we have to see what we can do with my daughter because I know back in the day they separate the child and the mom if they're under the age they'll take my child and I couldn't take care of her. So B.R. was like I can't and I said I understand because the last time was the last straw for me. They took her to 4258 Reese and they did something to her because that's the only time she ever got separated from me that day and I don't know what happened over there but it was enough that she said this is it. She went to school and told her counselor. She even joined the drill team and told the drummer coach and he was able to get help for her and moved her out. We was already home from school and she got the phone call from the counselor at school when she went to Dobbins that they moved her out."

(Id. at pgs. 30-31) Evet.R. offered a truly sympathetic perspective from her memory of when persons who came to their home in response to B.R.'s disclosure:

> "They came-the way they came to us—one did come to my school and was asking me questions. My question was what about my daughter. You want me to tell you what happened to me but I need to make sure my daughter is going to be safe and you aren't going to move us. I didn't hear nothing about safety for us. They wanted us to tell what was going on and then they brought us all together in the living room on the couch with my parents standing there and they asked us do you eat, did anybody do anything to you. They asked the same question that they asked B.R.—well B.R. told them but they were asking us while our parents was present right there. Again, we're fearing. We're not going to say anything. We're scared. We were kids...He walked the lady--we walked her out to the front door and he closed it and he said good job kids and then that was it, ya'll can go. We went upstairs to our room.

(Id. at pgs. 30-31) Evet.R. expressed to the jury that she had kept quiet even after she was put out of her home in 2017 at the age of twenty-one (21) years old because her father remained dangerous to her and her two children. She stated:

> "Like again, he was still out on the streets. My dad—listen, if he know you did something or suspects that you got information on your plan on doing something he will be waiting outside at night sitting in the car just waiting for you to show up.

You want to be careful for your safety. I didn't want nothing to happen to my children because they were traveling on buses."

(Id. at pgs. 32-33)

After acknowledging that her younger sister Evel.R., who was developmentally delayed was still living with their parents after Evet.R. was put out from their Philadelphia residence, Evet.R. corroborated the timeline events regarding disclosure of abuse by Evel.R. During this period, she remembered how her parents hid Evel.R and prevented her from having unsupervised contact with her sisters Evet.R. and B.R. especially after she became pregnant. Evel.R. managed to tell Evet.R. that her father had been touching her on a bed in the basement. Evel.R. later told Evet.R. by phone that:

"She said that they want me to get an abortion. They want me to get rid of it. It's my first baby. I want to keep my baby. Can you please tell them not to take my baby away, please? She was crying and I'm like Oh, my God …, let me find out what's going on. Now I'm mad. Let me find out what's going on. She said did you talk to him. They took me to that Blackwell Clinic and said I couldn't do it because I was too far along but I want to have it. She said dad got me to drink this stuff and he put a pill, I don't know what kind it was, into some orange drink. My dad, Willie Lee Robinson, made her drink this pill that bottled her up and was making her sick and it was making the juice dark. I don't know what kind of pill he was giving her but it made her sick."

(Id. at p. 36)

Because Evel.R. begged for help, Evet.R. called B.R. and together they bravely stepped forward to rescue their younger vulnerable sister and provided statements to investigators. Defense counsel's cross-examination of Evet.R. predominantly concentrated upon the length of the victims' non-disclosure of any abuse. The defense also explored the length of the sexual abuse of Evet.R. She reiterated that it began at when she was twelve (12) years old until the age of twenty-one (21) years old.

Evet.R. also revealed that Appellant continued to have sexual relations with her while she was pregnant. During this portion of the somewhat confusing testimony another incident was revealed that had occurred in 2007. Apparently, Appellant had engaged two people to beat up Evel.R. because she refused to have sex with him. He had told those persons who did the beating that she needed punishment because was being disrespectful with her parents. Evet.R. also informed the jury the extent of Evel.R.'s development disabilities. She estimated that Evel.R. had the mental maturity of a ten-year-old child. She stated that she continues to care for Evel.R. within her home.

During the afternoon of April 4, 2019, named victim Evel.R. testified. She began by ably recounting her age, the names of her siblings, the general street names of the houses in Philadelphia that she had lived in throughout her lifetime and accurately identified the schools that she had attended. She recalled that she had been moved to North Carolina at some point. Evel.R. recollected that when she was aged fourteen (14) years old, her dad "used to have sex with me, try to make me suck his bird and if I do not do it he will not give me no money....He'd be forcing his way on me and I be telling him no." (Id. at pgs. 86-87) Evel.R. further stated that he would have sex with her in her dad's bedroom in his bed." (Id. at p. 87)

Unlike the other victims, Evel.R. testified that she had believed that her mother had been sleeping and unaware of what was occurring while her father sexually assaulted her. (Id. at pgs. 87-88) She did note however that the abuse kept happening well after she had disclosed his actions to her mom. (Id. at 100) Evel.R. also revealed that both parents had tried to force her to get an abortion. Although she appeared to be childlike during her testimony, Evel.R. convincingly testified that Appellant had inserted his penis into her vagina and her mouth multiple times against her will. (Id.at pgs. 86-89) She also reported Appellant's constant fondling of her breast and butt.

(Id. at 88-90). Like her siblings, Evel.R. spoke of being awakened from sleep in the middle of the night and summoned into her parents' bedroom where Appellant would sexually assault her. (Id. 88-92) Just like her sister, Appellant had apparently encouraged Evel.R. to engage in sexual intercourse with her boyfriend at a very young age while he continued preying upon her. (Id. at 92-95)

Evel.R. stated that she had been afraid of her father. She often mentioned that he had ignored her pleas for him to stop. She like her sister described being physically and sexually attacked even when she was pregnant. She remembered that during the same time both of her parents had been forcing her to abort the baby. She said that her parents had taken her to a clinic and then to a hospital and that her blood pressure had been too high. (Id. at pgs. 92-96) She also reported that when she was pregnant her father had pushed her and caused her to trip and fall "after hurting her "he wanted to have sex" with her and she "said no." (Id. at pgs. 95-96)

Evel.R. testified that she was fearful and did not want to lose her baby and that her father kept touching her private parts and also forcing her to put her head down and to "suck his dick."(Id. at pgs. 96-99) She said that she had fearfully called her sisters for help by using the phone from a nearby store. (Id. at pgs. 99-100.) Evel.R. recalled:

> "...I called my sister and I told them, and that's when my sister came down and he say she's not here. I was here all that time. I went to the store and I had told my sister. She called and told my sister that we need to come get her. They came and moved me out of the house... B.R. and Evet.R."

(Id. at p. 99)

Evel.R. was also able to recollect when the "white guy" (Mr. DeRitis) had come to her house and had asked questions about what happening as well as going to the police "lady" and giving her the formal statement that had been marked, referenced and into evidence. (Id. at pgs. 100-101) The defense cross-examination of Evel.R. seemed to focus upon Evel.R's. different

-49-

perceptions of time and the number of schools that she had attended as it related to when "things of a sexual nature." Defense counsel also asked Evel.R. whether she could read or write and whether she had obtained her GED, presumably to attempt to discover whether or not her testimony had been coached. The net effect of these questions however only served to amplify her credibility. (Id. at pgs. 101-114)

One unique point of inquiry occurred during cross-examination when Evel.R. spoke of an occasion when she was thirty-five (35) years old. She said her father had shot her in the side with a BB gun. She remembered that it had broken her skin and caused her to bleed. She was not taken to the hospital. Rather, "(h)e put peroxide on it." (Id. at p. 116) When asked about whether her pregnancy was carried to term, she said that she had lost the baby. She was aware that the father of that unborn child had probably been her boyfriend. When questioned about Appellant having sexual intercourse with her while her boyfriend was visiting their home, Evel.R. testified that her father would wait until her boyfriend would leave and then have sex with her. (Id. at p. 118)

Following the cumulative evidence presented via each of the victims and their elder sister B.R., Evelyn Robinson, Appellant's wife, began her direct testimony before the jury on April 4, 2019 and finished following cross-examination and redirection on April 5, 2019. She admitted previously entering guilty pleas to various related offenses as Appellant's co-conspirator consistent with the agreement she had entered with the prosecution. Evelyn Robinson, then aged sixty-three (63) years old, initially confirmed relevant familial relationships, timelines and Philadelphia residences. She recalled marrying Appellant at the age of nineteen (19) years and thereafter having several children with him. Ms. Robinson identified the fact that she and Appellant were the biological parents of each of the victims. (N.T. 04/04/2019 pgs. 123-129)

Ms. Robinson first recalled portions of the sexual attack that had caused B.R. at aged fifteen (15) or sixteen (16) years old to disclose Appellant's abuse to authorities. She remembered waking up to seeing B.R. at night trying to pull away from Appellant while he was in their bed next to her as she slept. She said "I seen her screaming trying to pull away from her father talking like I'm tell, I'm tell and he realized I was woke and he let her go. ...He had her by the arms...Her legs were outside of the bed...She ran out of the room. She opened the door and she said I'm going to tell.'" (Id. at pgs.128-134) Ms. Robinson said in response to this attack was to go to the bathroom and then ask her husband what happened to which he had answered nothing. (Id. at pgs. 134-135) Remarkably, Ms. Robinson's memory was that she had realized that her husband was "trying to rape my daughter ...because I've seen him rape the other one." (Id. at p.135)

When redirected to speaking about B.R., Ms. Robinson recalled seeing Appellant on one other occasion sexually assaulting B.R. when she was much younger. She testified:

"One other time I seen him—she had her underwear off laying in the bed. He put her in the bed and he was rubbing himself on top of her rubbing his penis on her vagina...She had a T-shirt on and underwear off...I was coming up the steps, coming from downstairs to upstairs to the bedroom...(B.R.) was in the bed besides her father... Her had underwear on and T-shirt and took his pants off... (he was rubbing his penis on her) vagina...she was just laying there..."

(Id at 134-136) Ms. Robinson answered the natural question of what she did in response to viewing her husband rape her daughter, Ms. Robinson excused her lack of expected oppositional reaction by stating "If I said anything I would get beat up." (Id. at p. 137)

Upon inquiry about the named victim her younger son W.R., Evelyn Robinson recalled what she described "as the worst day of my life. I had to sit there and watch my husband have sex with my son. He done what he wanted to do." (Id. at p.139) She related how Appellant had "made" her put Vaseline on her son's penis and then directed W.R. to put his penis "on his back and on his butt." She said this type of rape had happened multiple times. She also corroborated

-51-

W.R.'s testimony that Appellant had often forced him during his early teen years to have sexual intercourse via insertions of his penis into vagina with her while Appellant "was jerking himself off." (Id. at pgs. 141-143)

Evelyn Robison also recalled that Appellant had attempted to force her two children W.R. and Evel.R. to have sexual intercourse with each other. Her memory was that Appellant often became very angry that Evel.R., who she had admitted had "special needs," "wouldn't keep still." (Id. at pgs. 144-147) She testified that "they never wanted to do it and he would get mad and tell her to go to her room." (Id. at p.147)

As to the sexual assaults by Appellant upon her daughter Evet.R., Ms. Robinson admitted that per her husband's direction, she had used sex toys including two described dildos upon Evet.R.'s vagina to prepare her for his penile penetration. She testified that he had also licked and kissed Evet.R.'s vagina. When she had demonstrated some recollection difficulty, Ms. Robinson's memory was refreshed with her prior verbatim interview to investigators. Thereafter, she further remembered that as to Evet.R.:

> "My husband and I was having--my husband called it makeup sex. He doing it that one day, one night, and he told me to wait a minute. I thought he was going to the bathroom but he got up left the bedroom. I thought he was going to the bathroom but he went and got Evet.R. and brought Evet.R. back to the room and put Evet.R. in the bed with us...She was young. She was still in school. She was still in high school or like seventh or eighth grade. She might have been a little younger.... He told her to take her underwear off. She got in the bed. Instead of him finishing with me he turned to Evet.R. and he rubbed his penis on Evet.R.'s vagina until he got himself off and then he sleep."

(Id at p.151) She then acknowledged that this had occurred "a couple of times" and further confirmed that Appellant had "put" her children W.R. and Evet.R. out of their house. (Id. at p. 152)

-52-

Ms. Robinson corroborated Evel.R. 's testimony that she had reached out previously to her mother to complain about her father's abuse. She also substantiated Evel.R.'s testimony concerning the attempted forced abortion and amplified the surrounding circumstances that resulted in the final disclosure that led to her and Appellant's arrest.

When inquiry was conducted during direct testimony of Appellant's repeated brutal physical attacks of all of her children, Ms. Robinson related that he had "whipped them" with "whatever he got his hands on. Most of the time it was a belt or whatever or her would make them stand in the corner holding the phone books and he would put 23 phone books—hold the phone books until he told them to put them down." (Id. at p. 57) Her testimony further illuminated the diverse depravity of Appellant's behavior as she described the manner in which he would strip and whip all of his children with a two-foot- long cut water hose. (Id. at pgs. 157-159)

Finally, on direct, Evelyn Robison reported that Appellant had repeatedly and severely beaten her during the same period he have been abusing all of their children She stated that he had threatened her with guns and had stabbed her at least once. Sadly, she still rationalized and minimized Appellant's conduct at times within her testimony. For instance, she blamed his drinking for the beatings and when she described his threats with his multiple guns, she added "He stabbed me in my leg. I don't think he meant to stab me in the leg but he ended up stabbing me in the leg." (Id. at pgs. 159-160)

Cross-examination of Evelyn Robinson centered upon the acknowledged fact that she had been testifying pursuant to an agreement with the Commonwealth and therefore had expected to receive a reduced sentence. Most of the defense challenges focused upon her lack of effort to detach herself and her children from the abuse. In response she had revealed the considerable change of Appellant's weight. She said that he had been a large stocky individual who routinely

-53-

beat her into submission. Upon further inquiry, she candidly disclosed that she had cause her W.R. to become erect before he, at the age of thirteen or fourteen years, was forced to insert his penis into Appellant's but.

During this portion of the testimony, Ms. Robinson acknowledged that she had participated in the sexual assaults and had done nothing to stop the ongoing abuse to her or her children because she was scared of Appellant. (N.T. 04/05/2019 at pgs. 36-42) As to the physical assaults, she confirmed viewing repeated beatings of all of her children. She admitted that she had not taken them to the doctor even if they were sore for multiple days. She did not remember W.R. being beaten so badly that he had bled from his penis. (Id. at p. 49) She also acknowledged that Appellant had forced her to take Evel.R. to the clinic and then might have been the father of the o Jefferson Hospital to have an abortion because "My husband said better to be safe than sorry" after she became aware that Appellant might have been the biological father of Evel.R.'s expected child. (Id. at p. 51) Her cumulative testimony corroborated her children's accounts and her conspiratorial conduct.

The last witness called by the Commonwealth was the assigned investigator Special Victim's Unit Detective Linda Blowes who had interviewed Guy DeRitis, the victims W.R., Evet.R., and B.R. She had also been present on the other side of glass of the interview room where Evel.R. has been formally interviewed by the assigned Philadelphia Childline Alliance evaluator. Detective Blowes also collected fetal tissue from Jefferson Hospital from Evel.R.'s miscarried child and submitted for DNA analysis and comparison with Appellant's sample. It was stipulated that the comparison reflected that Appellant was not the biological father of the miscarried child. Detective Blowes testified that Appellant had evaded arrest over a month period until he turned himself in and formally arrested pursuant to the warrants she had secured. Detective Blowes also

-54-

obtained the verbatim statement of admission for co-defendant Evelyn Robinson herein she completely admitted her complicity with her husband Willie Lee Robinson. (Id. at pgs. 58-92)

In sum, the collective evidence introduced at trial provided to the jury as fact finders overwhelming corroboration of each credible, graphic and consistent account of abuse. The varied forms of systematic sexual and physical attacks had robbed every named victim of his or her childhood innocence. To summarize, the collective direct and circumstantial evidence introduced in this case strongly supported the guilty verdicts reflecting that Appellant had committed multiple incidents of Rape, Involuntary Deviate Sexual Intercourse, Unlawful Contact with a Minor and Endangering Welfare of A Child and by so doing intentionally and methodically endangered their physical and mental welfare while corrupting each child's morals as part of a continuing course of exploitive conduct.

These crimes predominantly began and had repeatedly occurred while each complainant was between the ages of twelve and twenty-one years of age. Contrary to the appellate claim as inferred, no viable motivation for each traumatized victim to have fabricated anything had been had been presented. Accordingly, no trial court error had been committed by denying the post-sentence motions based upon sufficiency of evidence.

## IV. Appellant was not entitled to a new trial based on the weight of the evidence.

Similar to the sufficiency of evidence claim, Appellant had vaguely disputed within the *Defendant's Post-Sentence Motion* that the trial court had committed an abuse of discretion by denying his motion for a new trial on weight of the evidence grounds. This claim as all other recited claims had lacked factual and legal merit for the reasons as stated within this Court's analysis of the sufficiency of evidence claims and supplemented by the rationale recited below.

-55-

Essentially, the collective weight of all trial evidence had soundly supported all of fact-finding jury verdicts of guilt.

The weight given to the evidence is wholly the province of the finder of fact "who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Hunzer*, 868 A.2d 498, 506-507 (Pa. Super. 2005). Any motion for a new trial grounded in the contention that the "verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner." *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191-1192 (Pa. Super. 2004), appeal denied, 583 Pa. 689, 878 A.2d 864 (2005).

The decision whether to grant a new trial on this basis rests within the discretion of the trial court. *Commonwealth v. Hunter*, 381 Pa. Super. 606, 617, 554 A.2d 550, 555 (1989). "A trial court should award a new trial on the ground that the verdict is against the weight of the evidence only when the . . . verdict is so contrary to the evidence as to shock one's sense of justice and [make] the award of a new trial [ ] imperative so that right may be given another opportunity to prevail." *Commonwealth v. Whitney*, 511 Pa. 232, 239, 512 A.2d 1152, 1155-1156 (1986).

A weight-of-the-evidence claim "concedes that sufficient evidence exists to sustain the verdict but *questions which evidence is to be believed." Commonwealth v. Charlton*, 902 A.2d 554, 561 (Pa.Super. 2006) (quoting *Commonwealth v. Galindes*, 786 A.2d 1004, 1013 (Pa.Super.2001)) (emphasis added); such a claim only challenges how much weight should be "accorded . . . testimonial evidence." *Commonwealth v. Morgan*, 2006 PA Super 351, 913 A.2d 906, 909 (Pa. Super. Ct. 2006) (quoting *Armbruster v. Horowitz*, 744 A.2d 285, 286 (Pa. Super. 1999)).

The cumulative evidence that had been presented by the Commonwealth of Pennsylvania was credible, convincing and compelling. Nothing presented in this trial remotely suggested that

the jury's guilty verdicts had been entered contrary to, nor is it against the weight of, the evidence. The conclusions and verdict reached by the finders of fact were logically based on common sense inferences sufficient to eviscerate any possible conclusion that the convictions had been based on surmise or conjecture. None of the verdicts shocked anyone sense of fairness or justice. To the contrary, each victim's testimony standing alone was trustworthy and unwavering. Moreover, the corroborating forms of testimonial evidence from the investigators, Guy DeRitis, all victims, B.R. and the victims' mother corroborated all accounts.

Therefore, no trial court had been committed because none of the jury's verdicts had been properly entered against the super strength of the trial evidence. Since no error had been committed no remedy was warranted.

## V.    The Order of Sentence constituted reasonable exercises of sentencing discretion.

Appellant recited related appellate claims within the statement of alleged errors and post-sentence motion concerning this Court's imposition of the Judgments and Order of Sentence. Essentially, Appellant claimed that the imposed individual and aggregate sentences had been manifestly excessive principally because the sentences had been imposed to run consecutively. Incorporated within this claim was the previously raised assertions at time of sentencing, that Appellant's stated age should have accorded Appellant shorter terms of confinement. The respective sentences for each felony offense for which Appellant had been convicted however had been justly imposed and well-deserved given the repetitive acts of intensely intrusive and destructive conduct committed over the critically developmental years of each of his three biological children's lives.

### A.    Appellate Review of the Sentencing Court

-57-

Appellate review of this matter begins with the statutory prescription contained within 42 Pa. C.S.A. § 9781(b), directing that an appeal may be granted at the discretion of the appellate court only where it appears that there is a substantial question that the sentence imposed is not appropriate under this chapter. Thus, regarding the discretionary aspects of the sentencing, there is no automatic right to appeal. See *Commonwealth v. Cook*, 941 A.2d 7 (Pa. Super. 2007). The Defendant does not have a valid claim of excessive sentence without including an additional and more specific violation of the sentencing code. Only when a sentencing claim sets forth the manner in which either a particular provision of the Sentencing Code or an underlying fundamental norm of the sentencing process was violated, does a claim of excessiveness present a substantial question. *Commonwealth v. Mouzon*, 812 A.2d 617, 620 (Pa. 2002). A blanket claim of excessiveness, with no further allegations, does not create a substantial question. *Id.*

Moreover, within this Commonwealth, the "imposition of a sentence is vested in the discretion of the sentencing court and will not be disturbed absent a manifest abuse of discretion." *Commonwealth v. Smith*, 543 Pa. 566, 673 A.2d 893, 895 (1996). This standard reflects that the sentencing court is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Commonwealth v. Ward*, 524 Pa. 48, 568 A.2d 1242, 1243 (1990). Consistent with this standard of record review, the appellate court shall have regard for: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; and ... (3) the findings upon which the sentence was based." 42 Pa. C.S.A. § 9781 (d) (1) and (3).

As the instant record of the respective hearings conducted, this Court succinctly noted thorough incorporation and evaluation of all relevant sentencing factors. Prior to the formal sentencing hearing, this Court had reviewed all submitted relevant sentencing materials including

the mental health evaluation and the presentence investigative reports that had been previously ordered and the recommended sentencing guidelines promulgated by Pennsylvania Commission on Sentencing.

This Court incorporated the felony grading and offense gravity score of each offense. The parties by and through their respective counsel acknowledged the Court's assessment of the offense gravity scores and Appellant's prior record score. (N.T. 06/13/2019 pgs. 4-7) At the sentencing hearing, this Court considered the mitigating arguments made by defense counsel, which included references to Appellant's age and mental health difficulties. (Id. at pgs. 6-10) Appellant was given ample opportunity to allocate even well after the allotted point in time allotted. (Id. at pgs. 20-37)

This Court also measured the prosecution's argument that referenced the tremendous amount of mental damage that Appellant had purposefully and frequently inflicted upon each victim over critical time periods in their lives. (Id. at pgs. 17-20) This Court as the presiding jurist of the jury trial completely comprehended that the harm to each person had been life-altering. Indeed, the circumstances surrounding the ultimate disclosure demonstrated that demonstrated the ingrained level of Appellant's depravity. The risk to Evel.R.'s future particularly given her special needs remained a grave concern. This Court recalled the significant toll that his remorseless brazen conduct caused and the potential threat that he had presented to the community particularly defenseless children.

The victim impact testimony that had been considered by this Court was particularly poignant. Evet.R. began with answering this Court's question of how she was faring as follows:

"I feel better. I feel good, yes...
I'm just you know-I am—the family, we are still hurt because our family is broken. We want justice, now, you know. We want closure. That's why we're here today, me and Evel.R., because she need this. So she can know that she will

be safe, you know. She not keep looking over her shoulders, thinking someone's gonna hurt her.

She said to me this morning that it felt good to wake up and sleep as long as you want and know that anybody gonna come mess with you while you're sleeping.

I said, yeah, you're safe.

She said I just laid there and I didn't hear no noise. I didn't hear nobody coming in my room. I can leave my door opened. I can leave my door unlocked.

I said, yeah, you're safe.

So today she want to be here to know that she will be safe and that's why I brought her out...

I'm hurt because we call our father to so many children that was a privilege. And we don't have no father.

Like, right now, right, no one have a father but my own children. Because to be a father, you're supposed to protect us and make sure we stay safe and not bring the harm to us. And that was brought to us. So that's one thing we will be missing is our father, but we will still be okay.

I don't know what else can be said today. I just want her to have closure, because I already have closure. I forgave him, but I didn't forget what we went through. you did. That's why we still have, like a bond of talking.

I was able to communicate with him, even though he did what he did to hurt me. .

And to this day, I still will forgive him. I just didn't never forget. And that's what I'm trying to explain to her. It's okay to forgive but you don't have to forget, you know, of what you have been through.

I thought—to this day, I just want him to apologize to me and Evel.R. so we can, at least, take that back to our family that he did apologize to all of us. So, if don't say anything else today, he will apologize for what he had done. ...."

(Id. at pgs. 10-17)

Notably, Appellant not did not apologize in response but remained verbally combatant, non-repentant and obstructionist. After acknowledging thorough consideration of all relevant sentencing factors, this Court succinctly recited in summary the sound rationale for the consecutive imposition of the respective sentences that individually fell largely within the recommended guidelines for each crime committed as follows:

"My sentence has to do with the actions of which you were found guilty by this jury. All right. And those actions, sir, have to do with the repetitive rape, aggravated assault, involuntary deviate sexual intercourse, endangerment, the continual beating and sexual assault of each of your children, and the employment of your wife, their mother in the sadistic activities to which you engage over an

-60-

extensive period of time that ran like a toxic waste dump through the family that of which you wanted to have available to you.

You used your children to satisfy your depraved desires over and over and over and over and over and over again, and you caused such damage to those people who you were entrusted in your care--

(The Defendant interrupted)

I'm talking now. ---entrusted to your care, and the amount of damage that you have caused. And yet, to have exhibited any remote remorse for your doings is well beyond comprehension.

Now, I have listened to you, I have listened to every single person that testified in this case. I have had nightmares, which, I'm sure, do not even remotely match the nightmares that they had to endure, just rom listening to what you did.

And yet you sit here before me right here today with not one ounce of indications of appreciation of the damage that you have done, Mr. Robinson.

And my sentence will reflect that accordingly. I'm going to deviate from the guidelines. And I'm going to give you the sentence that I deem fit, because you are a danger to this community..."

(The Defendant interrupted.)

I only regret that we didn't get you younger so less damage could have been done.

And I do recall vividly, Mr. Robinson, Your varied attempts to attempt to shield yourself from the justice system by pretending to be incompetent and not with it. And you are very much with it. You're probably one of the most manipulative human beings that I have come across in the 59 years that I have been on this earth.

The damage that you did to your children., not the least of which, to Evel.R., who had mental health challenges of her own, and took advantage of people that were weaker than you because you could and you did over and over again.

The testimony that I heard was shockingly credible and convincing. It broke my heart. But I do know this Mr. Robinson, that despite what you did to them, I can see the demonstrated ability in your children to rise above it-

Your son W.R. is a lost soul. You're responsible for that.

Your wife Evelyn, I do believe the genesis of her depraved behavior came because of you. That would not have occurred, but for you. She talked—she testified also very credibly, in some respects, as to what you put her through.

The toxic effect of your actions will be felt, not only by your children, but it will go on further because every single one of them was marked in a different way. And every one of them will have to deal with the trauma that you inflicted."

(The Defendant interrupted)

(N.T. 06/13/2019 pgs. 28-31)

This Court further imposed the respective state supervised periods of confinement, conditions of sentence, accorded credit for custodial time served and informed Appellant of the

SORNA Tier III Sexual Offender lifetime registration and other requirements. Post-verdict rights were properly provided to Appellant by his counsel.

The record demonstrated that this Court duly considered all relevant sentencing factors presented as they applied to each individual offense. This Court as the presiding jurist had a front row seat to the overwhelming evidence that proved Appellant had repeatedly committed each felony grade offense for which Appellant had been convicted. He acted purposefully with premeditation and without any care of consequences. To the contrary, he remained remorseless.

Further, tremendous impact of Appellant's continuing predatory course of deviant conduct had upon each biological child, as well as the rippling harm upon the trusting members of their family members and community was a driving sentencing factor. The resulting harm that Appellant had inflicted each victim was incalculable. Even early on the negative effects of his continuing criminal conduct upon the children's mother to enlist her complicity was uniquely malicious.

The behavioral and personality changes to each victim, during these critical foundational childhood years were well-documented. Each suffered greatly and had been repeatedly subjected to constantly feeling fear, helplessness, shame, isolation, confusion and loss of self-worth and control over their bodies.

As the presiding trial judge, this Court also considered Appellant's exhibition of zero repentance for his behavior. After voicing a thorough incorporation an evaluation of all relevant factors, this Court found that Willie Lee Robinson had posed a serious threat to the community, especially to children in the future. In short, the individually imposed sentences as applied to each repeatedly committed offense and that addressed the harm done were warranted.

B. Appellate Review of Aggregation in Sentence

Similarly, pursuant to 42 Pa. C.S.A. § 9781(d)(1) and (3), this Court operated within its discretionary right to impose the sentences consecutively. The sentencing court's exercise of discretion by imposing consecutive as opposed to concurrent sentences is not viewed as raising a substantial question that would allow the granting of allowance of appeal in our Commonwealth. *Commonwealth v. Marts*, 889 A.2d 608 (Pa. Super. 2005).

In the instant matter, individualized consecutive sentences upon Appellant had been imposed as to some offenses only after careful consideration of all relevant sentencing factors including the paramount need for protection of the public, the gravity of the offense, and Appellant's poor prospect of rehabilitation. Imposition of consecutively running sentences for three of the four felony graded offenses directly resulted from the overwhelming evidence that Appellant repeatedly committed each offense. Thus, Appellant had not raised any substantial question that the consecutive sentences imposed had been inappropriate or contrary to a fundamental norm underlying the sentencing code.

Additionally, the weight given by the Court to the individual relevant sentencing factors is not a substantial question because this simply raised a disagreement about this Court's determination of facts and the weight of factors. Again, the sentencing court is given broad discretion in formulating a sentence, with no automatic right of review available. *Commonwealth v. Mastromarino*, 2 A.3d 581, 585 (Pa. Super. Ct. 2010). An appeal can only be granted if there is a substantial question as to a violation of a specific sentencing code or a fundamental norm. 42 Pa. C.S.A. § 9781; *Mouzon*, 812 A.2d at 627.

C. Appellate Review: Applying Standard of Abuse in Discretion

Even if the reviewing court found a substantial question, the sentencing court's determination can only be overturned for an abuse of discretion. *Commonwealth v. Walls*, 926

A.2d 957, 961 (Pa. 2007). Such an abuse is <u>not</u> just a mere disagreement. *Id.* It must be "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will." *Id.* This standard is embodied in the language of section 9781(c), which dictates that when sentencing outside the guidelines, a sentencing court's determination must stand unless the sentence was unreasonable. 42 Pa. C.S.A. § 9781(c).

A sentence is reasonable when it includes examination of the public protection, the crime's gravity, and the defendant's rehabilitative needs, as listed in section 42 of the Pennsylvania Code. 42 Pa. Cons. Stat. Ann. § 9721 (West); *Walls*, 926 A.2d at 964. Additionally, when the sentencing court has reviewed a presentence report, it is presumed that the court has considered the information it contains. *Commonwealth v. Boyer*, 856 A.2d 149, 154 (Pa. Super. Ct. 2004) *aff'd* 891 A.2d 1265 (Pa. 2006). Facts can be considered, pursuant to § 9721(b)'s sentencing requirements, even if the facts are subsumed within the guideline recommendation. *Commonwealth v. Sheller*, 961 A.2d 187, 192 (Pa. Super. Ct. 2008).

Per the statutory authority of our Commonwealth's duly elected legislature, this Court was imbued with the ability to levy the sentences as imposed. None of the imposed Orders and Judgments of Sentence had illegally surpassed the maximum period of confinement permitted by each applicable statute. This Court verbalized more than once the fact that the recommended guideline calculations promulgated by the Pennsylvania Sentencing Commission had been duly considered. Moreover, most of the respective sentences that had been imposed for each individual consecutively running offense fell within those correctly computed and recommended guidelines. To the extent there was some deviation this was specifically noted and explained.

As the instant record reflected, when sentencing Appellant, this Court had duly evaluated all sentencing factors including his familial and social history, his past criminal conduct,

rehabilitative efforts and needs, and principally the gravity of Appellant's predatory conduct that entailed multiple forms of child rapes which reflected unequivocally the potential danger that he posed particularly to other children within our community. Thus, this Court acted well within authorized sentencing discretion.

CONCLUSION

In reviewing the entire record, this Court finds no harmful, prejudicial, or reversible error. Accordingly, the Orders and Judgments of the trial court should be affirmed.

By the Court,

DATE: 9/15/2020

Anne Marie B. Coyle, J.

-65-